IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

WILLIAM WOODSON,           )
    Plaintiff,             )
                        )
       v.             )      Civil No. 3:17cv347 (REP)
                        )
NANCY A. BERRYHILL,       )
Acting Commissioner of Social Security,  )
    Defendant.           )
_____)

## REPORT AND RECOMMENDATION

On July 15, 2013, William Woodson ("Plaintiff") applied for Social Security Disability

Benefits ("DIB") and, on July 31, 2013, for Supplemental Security Income ("SSI") under the

Social Security Act ("Act"), alleging disability from lumbar disc problems, with an alleged onset

date of August 20, 2012 — later amended to August 8, 2013. The Social Security

Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration.

Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision

and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as

the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred in failing to (1) consider all of Plaintiff's cervical impairments at step

two; (2) find that Plaintiff satisfied all of the criteria for Listing 1.04A at step three; (3) conduct a

function-by-function analysis before formulating the residual functional capacity ("RFC"); and,

(4) properly assess Plaintiff's credibility. Plaintiff further argues that the Appeals Council erred

in failing to remand in light of new evidence submitted to the Appeals Council. (Mem. in Supp.

of Pl.'s Mot. For Summ. J. ("Pl.'s Mem.") (ECF No. 18) at 2-29.)  Lastly, Plaintiff requests that

the Court accept the after-acquired report of Arthur Lorber, M.D.  (Pl.'s Mot. for the Ct. to

Receive the After-Acquired Rep. of Dr. Lorber and Suppl. Br. ("Pl.'s Suppl. Mot.") (ECF No.

25).)  This matter now comes before the Court for a Report and Recommendation pursuant to 28

U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter

ripe for review.[1]  For the reasons that follow, the Court recommends that Plaintiff's Motion for

Summary Judgment (ECF No. 15) be DENIED, that Plaintiff's Motion for the Court to Accept

the After-Acquired Report of Dr. Lorber (ECF No. 25) be DENIED, and Defendant's Motion for

Summary Judgment (ECF No. 28) be GRANTED and that the final decision of the

Commissioner be AFFIRMED.

## I.     PROCEDURAL HISTORY

On July 15, 2013, Plaintiff filed an application for DIB and, on July 31, 2013, Plaintiff

filed an application for SSI with an alleged onset date of August 20, 2012.  (R. at 74, 256, 266.)

The SSA denied these claims initially on December 11 and December 12, 2013, and again upon

reconsideration on August 11, 2014.  (R. at 138-39, 156-57.)  At Plaintiff's written request, the

ALJ held a hearing on February 4, 2016.  (R. at 92-137, 211-12.)  During the hearing, Plaintiff

amended his alleged onset date to August 8, 2013.  (R. at 97.)  On March 2, 2016, the ALJ

issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify

as disabled under the Act, because he could perform jobs existing in significant numbers in the

---

[1]     The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

national economy. (R. at 74-86.) On March 16, 2017, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-7.)

On August 10, 2017, Plaintiff filed a motion requesting oral argument. (ECF No. 16.) On October 10, 2017 — the day before the deadline expired for Defendant to file her motion for summary judgment — Plaintiff filed a motion to suspend the current briefing schedule, so that Plaintiff could submit Dr. Lorber's report and a supplemental brief in support of Plaintiff's Motion for Summary Judgment. (ECF No. 23.) On October 12, 2017, the Court granted Plaintiff's motion to suspend the current briefing schedule, so that Plaintiff could submit the additional records and a supplemental brief. (ECF No. 24.) Finding that the issues Plaintiff raised in his Brief in Support of Oral Argument (ECF No. 19) could be sufficiently addressed in a supplemental brief, the Court also denied Plaintiff's request for oral argument. (ECF No. 24.)

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because

3

substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's RFC, accounting for the most

4

that the claimant can do despite his physical and mental limitations.  §§ 404.1545(a), 416.945(a).
At step four, the ALJ assesses whether the claimant can perform his past work given his RFC.
§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, at step five, the ALJ determines whether the
claimant can perform any work existing in the national economy.  §§ 404.1520(a)(4)(v),
416.920(a)(4)(v).

## III.    THE ALJ'S DECISION

On February 4, 2016, the ALJ held a hearing during which Plaintiff (represented by
counsel) and a vocational expert testified.  (R. at 92-137.)  On March 2, 2016, the ALJ issued a
written opinion, finding that Plaintiff did not qualify as disabled under the Act.  (R. at 74-86.)

The ALJ followed the five-step evaluation process established by the Social Security Act
in analyzing Plaintiff's disability claims.  (R. at 75-85.)  At step one, the ALJ found that Plaintiff
had not engaged in substantial gainful activity since August 8, 2013, the amended alleged onset
date.  (R. at 76.)  At step two, the ALJ found that Plaintiff suffered from a single severe
impairment — degenerative disc disease.  (R. at 76.)  At step three, the ALJ held that Plaintiff
did not have an impairment or combination of impairments that met or medically equaled the
severity of one of the listed impairments.  (R. at 77.)

In assessing Plaintiff's RFC, the ALJ determined that Plaintiff could perform a range of
light work with additional limitations.  (R. at 77.)  Specifically, Plaintiff could frequently climb
ramps and stairs, occasionally climb ladders, ropes and scaffolds, and frequently balance, stoop,
kneel, crouch and crawl.  (R. at 77.)  At step four, the ALJ found that Plaintiff could not perform
any past relevant work.  (R. at 84.)  At step five, the ALJ determined that Plaintiff could perform
jobs existing in significant numbers in the national economy.  (R. at 84-85.)  Therefore, Plaintiff
did not qualify as disabled under the Act.  (R. at 84-85.)

IV.    ANALYSIS

Plaintiff, forty-nine years old at the time of this Report and Recommendation, previously worked as chicken catcher, laborer and a machine operator. (R. at 292, 298.) He applied for Social Security Benefits, alleging disability from lumbar disc problems, with an alleged onset date of August 20, 2013 — later amended to August 8, 2013. (R. at 97, 292.) Plaintiff's appeal to this Court alleges that the ALJ erred in (1) failing to consider all of Plaintiff's cervical impairments at step two; (2) failing to find that Plaintiff satisfied all of the criteria for Listing 1.04A at step three; (3) failing to conduct a function-by-function analysis before formulating the RFC; and, (4) in assessing Plaintiff's credibility. (Pl.'s Mem. at 2-13, 19-29.) Plaintiff further argues that the Appeals Council erred in failing to remand Plaintiff's claims to the ALJ in light of new evidence. (Pl.'s Mem. at 12-19.)  Finally, Plaintiff requests that this Court accept the after-acquired report of Dr. Lorber. (Pl.'s Suppl. Mot.)  For the reasons set forth below, the ALJ did not err in his decision, the Appeals Council did not err in rejecting Plaintiff's request for review and the Court rejects Dr. Lorber's after-acquired report.

1. **The ALJ Satisfied Step Two by Finding that Plaintiff Suffered from a Single Severe Impairment.**

Plaintiff argues that the ALJ erred at step two by failing to classify his cervical spinal stenosis, cervical myelomalcia and cervical myelopathy as severe impairments. (Pl.'s Mem. at 2-7.) Defendant responds that the ALJ sufficiently discussed Plaintiff's cervical impairments throughout his opinion and properly explained why the medical evidence supported the ALJ's finding that Plaintiff could perform light work. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 29) at 18-21.).

At step two, the ALJ must consider the claimant's medically determinable impairments. 20 C.F.R. §§ 404.1521, 416.921 ("a physical or mental impairment must be established by

objective medical evidence from an acceptable medical source" — a claimant's statements of symptoms alone are insufficient). "The Supreme Court has held that this step of the disability evaluation is a *de minimis* threshold." *Williams v. Astrue*, 2010 WL 395631, at *14 (E.D. Va. Feb. 2, 2010) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146-47 (1987)). In *Yuckert*, the Supreme Court explained that step two of the sequential analysis "increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." 482 U.S. at 153.

An ALJ satisfies step two by finding a severe impairment and proceeding through the rest of the sequential analysis. *McCormick v. Soc. Sec. Admin., Comm'r*, 619 F. App'x 855, 858 (11th Cir. 2015); *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) ("The finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two.").

Here, the ALJ satisfied step two, because he found that Plaintiff suffered from a severe impairment — degenerative disc disease — and proceeded to the next step of the sequential analysis. (R. at 76.) Plaintiff argues that "this is not a scenario where the ALJ found at least one, severe impairment, but then considered all of the claimant's impairments and related functional limitations in assessing how much work the plaintiff could still do." (Pl.'s Mem. at 4 (citing *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013)).) Defendant asserts that the ALJ's failure to address Plaintiff's cervical spinal stenosis, myelomalacia and myelopathy at step two constitutes harmless error, because the ALJ appropriately considered and discussed Plaintiff's cervical impairments throughout his opinion. (Def.'s Mem. at 18-19.)

7

An ALJ's incorrect characterization of a severe impairment as "non-severe" or failure to address a medically determinable impairment at step two does not automatically require remand. Rather, courts will find no reversible error — or treat the error as harmless — provided that the ALJ considered all of the claimant's impairments in the sequential analysis. *Compare Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (finding no reversible error where the ALJ labeled an impairment non-severe, but properly considered the impairment in the RFC assessment), *with McCormick*, 619 F. App'x at 858 ("[S]tep two is merely a filter, and any error in considering an additional impairment is harmless since it does not factor into the determination of disability."), *and Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (omission of the plaintiff's bursitis at step two constituted harmless error, because the ALJ "extensively discussed" the plaintiff's bursitis at step four of the analysis).

While the Fourth Circuit has not addressed the precise issue, district courts in this Circuit have adopted the view that an ALJ does not commit reversible error by omitting an impairment at step two, so long as the ALJ considers the impairment in subsequent steps. *Clark v. Comm'r of Soc. Sec.*, 2010 WL 2730622, at *11 (E.D. Va. June 3, 2010), *report and recommendation adopted*, 2010 WL 2731380 (E.D. Va. July 9, 2010) (quoting *Jones v. Astrue*, 2009 WL 455414, at *2 (E.D.N.C. Feb. 23, 2009) ("[I]t is not reversible error where an ALJ does not consider whether an impairment is severe at step two of the sequential evaluation provided the ALJ considers that impairment in subsequent steps.")); *see also Jones v. Comm'r of Soc. Sec.*, 2011 WL 3273129, at *14 (E.D. Va. June 9, 2011), *report and recommendation adopted*, 2011 WL 3268120 (E.D. Va. July 28, 2011) (citing *Clark*, 2010 WL 2730622, at *11) (finding no error

8

where the ALJ considered omitted impairment in subsequent steps); *Nuckles v. Astrue*, 2009 WL 3208685, at *9 n.4 (E.D.N.C. Oct. 5, 2009) (same).[2]

For example, in *Clark*, the court found no reversible where the ALJ failed to discuss whether Clark's cervical herniated discs qualified as a severe impairment at step two. 2010 WL 2730622, at *11. Rather, the ALJ sufficiently considered Clark's cervical herniated discs in the RFC assessment, noting that Clark's doctors endorsed chronic back pain in their treatment records, but conservative treatment, such as medication, reasonably controlled Clark's pain. *Id.* Similarly, the court in *Jones* found no reversible error where the ALJ failed to discuss Jones' back pain at step two, but sufficiently considered his lower back pain in later steps, "though not necessarily in the most straightforward manner." 2009 WL 455414, at *2-3.

Like the ALJs in *Clark* and *Jones*, the ALJ here omitted discussion of Plaintiff's cervical spinal stenosis, cervical myelomalcia and cervical myelopathy at step two, but gave appropriate consideration to those impairments later in the RFC assessment. (R. at 78-84); *Clark*, 2010 WL 2730622, at *11; *Jones*, 2009 WL 455414 at, *2-*3. First, the ALJ noted that Plaintiff cited, *inter alia*, "cervical stenosis with cord compression" as one of the impairments that rendered him disabled. (R. at 78.) Second, in the ALJ's discussion of the medical evidence, he noted that "[a] February 27, 2014 MRI of the cervical spine . . . revealed disc osteophyte complex at C3-C4 causing *stenosis* and increased . . . signal and cord volume loss consistent with myelomalacia[.]"

---

[2]     Rather than finding "no reversible error," other courts in this District have held that an ALJ's failure to consider a claimant's impairment at step two constitutes harmless error, so long as the ALJ gives adequate consideration to the omitted impairment at later steps in the sequential analysis. *E.g.*, *Murphy v. Colvin*, 2016 WL 4764820, at *10 (E.D. Va. Sept. 12, 2016); *Bennett v. Colvin*, 2014 WL 1603737, at *11 (E.D. Va. Apr. 21, 2014), *report and recommendation adopted*, 2014 WL 1603737, at * 1; *Cook ex rel. A.C. v. Colvin*, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013), *report and recommendation adopted*, 2013 WL 1288154 (E.D. Va. Mar. 25, 2013).

(R. at 80 (emphasis added).)  Third, the ALJ noted that in April 2014, Plaintiff presented to University of Virginia Health Systems ("UVA Health Systems") with cervical stenosis and cervical cord signal change; he underwent an anterior cervical discectomy and fusion ("ACDF") and tolerated the procedure "well and without complication;" and, UVA Health Systems discharged Plaintiff the day after the procedure "with the diagnosis of cervical stenosis[.]" (R. at 80.)  Fourth, the ALJ stated that a May 2014 x-ray of Plaintiff's cervical spine revealed normal findings. (R. at 80-81.)

Next, the ALJ discussed the results of a September 2014 physical examination conducted by Gregory Helm, M.D., in which Plaintiff experienced "some numbness in his right leg," but showed no signs of myelopathy. (R. at 81.)  Finally, the ALJ discussed Plaintiff's December 2015 emergency room visit to Centra Southside Community Hospital ("CSC Hospital"), in which Plaintiff displayed cervical tenderness upon physical examination, "but he was neurologically[.] intact, and the remainder of the exam was unremarkable[.]" (R. at 81.)  The ALJ further discussed the results of an x-ray and MRI taken of Plaintiff's cervical spine during that visit. (R. at 81.)  The x-ray revealed "surgical and degenerative changes," while the MRI showed "some mild compression of the cervical spine." (R. at 81.)  The ALJ noted that the hospital discharged Plaintiff "in stable condition with the diagnosis of cervical spine pain." (R. at 81.)

Plaintiff argues that mere recitation of the medical evidence does not satisfy the ALJ's duty to "build an accurate and logical bridge from the evidence to his conclusion." (Pl.'s Mem. at 5 (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (additional citation omitted)).) But the ALJ did more than merely regurgitate Plaintiff's medical records.  In discounting the alleged severity of Plaintiff's limitations and in formulating the RFC, the ALJ explained (i)

inconsistencies between Plaintiff's stated capabilities and those reported by his spouse in a third-party function report, (ii) the conservative nature of Plaintiff's treatment and (iii) Plaintiff's failure to remain compliant with his prescribed course of treatment. (R. at 81-82.) Finally, the ALJ stated that Plaintiff's "reasonably good health . . . and relatively benign physical examinations belie[d] [his] allegations of disabling symptoms or functional limitations." (R. at 82.) Although the ALJ failed to classify Plaintiff's cervical stenosis, myelomalacia and myelopathy as severe or non-severe impairments at step two, the ALJ adequately discussed those impairments in the RFC assessment. While, "collapsing of the analysis of the evidence by an ALJ is not the preferred form of opinion writing for an ALJ because it makes review of his opinions more difficult, . . . it is not necessarily reversible error." *Jones*, 2009 WL 455414, at *3 (citation omitted). Here, the ALJ sufficiently discussed Plaintiff's conditions throughout his decision such that he did not commit reversible error at step two.

### 2. The ALJ Did Not Err at Step Three.

Next, Plaintiff argues that the ALJ erred in concluding that Plaintiff did not satisfy the requirements of Listing 1.04A. (Pl.'s Mem. at 7-13.) First, Plaintiff asserts that the ALJ failed to "correlate the medical evidence of record with the criteria set forth in [the listing]." (Pl.'s Mem. at 7-8.) Second, Plaintiff argues that the ALJ failed to properly apply the medical evidence to the listing criteria. (Pl.'s Mem. at 8-13.) Defendant responds that substantial evidence supports the ALJ's step three finding and that the ALJ's discussion of the medical evidence in the RFC analysis satisfied the ALJ's duty to correlate the evidence with the listing criteria. (Def.'s Mem. at 21-26.)

When issuing a decision, an ALJ "is not required to use particular language or adhere to a particular format in conducting his analysis;" the decision must only show that "there is

11

sufficient development of the record and explanation of findings to permit meaningful review."

*Moore v. Astrue*, 2010 WL 3394657, at *6 n.12 (E.D. Va. July 27, 2010).  But an ALJ only needs

to review medical evidence once in his opinion.  *McCartney v. Apfel*, 28 F. App'x. 277, 279-80

(4th Cir. 2002).  Therefore, the reviewing court will determine if the ALJ's decision as a whole

provides substantial evidence supporting the step three evaluation.

To meet Listing 1.04A, Plaintiff must have a disorder of the spine that results in

compromise of a nerve root or the spinal cord, with:

> Evidence of nerve root compression characterized by neuro-anatomic distribution
> of pain, limitation of motion of the spine, motor loss (atrophy with associated
> muscle weakness or muscle weakness) accompanied by sensory or reflex loss and,
> if there is involvement of the lower back, positive straight-leg raising test (sitting
> and supine).

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04A.  To satisfy Listing 1.04A, the impairment must

also last or be expected to last for at least twelve months.  §§ 404.1509; 416.909.

At step three, the ALJ held that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of Listing 1.04.  (R. at 77.)  The ALJ

acknowledged that Plaintiff's representative testified at the hearing that Plaintiff satisfied the

Listing 1.04 criteria.  (R. at 77.)  After reviewing the evidence, the ALJ found otherwise.  (R. at

77.)  In support of his finding, the ALJ explained that "the evidence of record does not establish

evidence resulting in" the criteria set forth in Listing 1.04.  (R. at 77.)  Further, the ALJ noted

that state agency physicians reviewed Plaintiff's medical records and likewise concluded that

Plaintiff did not meet or medically equal the listing criteria.  (R. at 77.)  Nor did any evidence

submitted after the state agency physicians completed their review "warrant a different

determination."  (R. at 77.)  Finally, the ALJ explained that no treating or examining physician

opined that Plaintiff met the listing criteria.  (R. at 77.)

12

Contrary to Plaintiff's argument, the ALJ correlated the medical evidence to his opinion. (R. at 77-84; Pl.'s Mem. at 7-8.)  In *Radford v. Colvin*, the Fourth Circuit held that the district court abused its discretion by awarding benefits, rather than remanding the case for further explanation from the ALJ as to why the plaintiff did not satisfy the criteria for Listing 1.04A. 734 F.3d 288, 295-96 (4th Cir. 2013).  The ALJ in that case "summarily concluded that Radford's impairment did not meet or equal a listed impairment, but he provided no explanation other than writing that he 'considered, in particular,' a variety of listings, including Listing 1.04A, and noting that state medical examiners had also concluded 'that no listing [was] met or equaled.'"  *Id.* at 295 (describing the ALJ's decision as "devoid of reasoning").  The court also took issue with the fact that the ALJ "reject[ed] the opinions of Radford's treating physicians in favor of the state medical examiners" without sufficient explanation.  *Id.* at 295-96.

Arguing that the ALJ in this case provided similar conclusory reasoning at step three, Plaintiff urges the Court to remand his case.  (R. at 77; Pl.'s Mem. at 7-8.)  Indeed, the Fourth Circuit made clear that an ALJ's citation to state agency physicians' opinions alone did not constitute substantial evidence in support of the ALJ's step three finding.  734 F.3d at 295-96. But unlike the ALJ in *Radford*, the ALJ here additionally cited the fact that no treating or examining physician found that Plaintiff satisfied the criteria for Listing 1.04A.  (R. at 77.)  The ALJ also properly explained the weight that he afforded to the opinions of the state agency physicians and Plaintiff's treating physician in the RFC assessment.  (R. at 77, 83.)

In August 2013, Plaintiff's treating physician, Cynthia Sessums, D.O., instructed Plaintiff not to work for two days and to avoid heavy lifting until his follow-up appointment three to four days later.  (R. at 448.)  The ALJ afforded Dr. Sessums' opinion that Plaintiff could not work no weight, because she imposed the work restriction for only a limited time period.  (R. at 83.)

13

With respect to the state agency physicians' opinions, the ALJ afforded partial weight to the opinion of Michael Cole, D.O., who conducted the initial disability determination. (R. at 83, 150-53.) Dr. Cole opined that Plaintiff could occasionally climb ladders, ropes and scaffolds, frequently stoop, kneel, crouch and crawl, and had no limitation with respect to climbing ramps and stairs. (R. at 153.) The ALJ afforded great weight to the more restrictive opinion of Catherine Howard, M.D., who reviewed Plaintiff's claim on reconsideration. (R. at 83, 168.) Dr. Howard opined that Plaintiff could frequently climb ramps and stairs, occasionally climb ladders, ropes and scaffolds, and frequently balance, stoop, kneel, crouch and crawl. (R. at 168.) The ALJ described these opinions as "balanced and objective, consistent with the overall evidence of record" and supportive of the RFC. (R. at 83.)

As Defendant points out, the ALJ also gave sufficient consideration to the medical evidence showing that Plaintiff did not satisfy the Listing 1.04A criteria in the RFC assessment. (R. at 79-81; Def.'s Mem. at 22-23.) For example, at step three the ALJ stated that the record did not show evidence of limited motion of the spine or motor loss accompanied by sensory or reflex loss associated with Listing 1.04A. (R. at 77.) In the RFC assessment, the ALJ correlated the medical evidence to his step three finding by discussing the following: in December 2013, Plaintiff's physical examination showed that Plaintiff produced positive straight leg test results and felt some numbness in his feet, but he experienced no tenderness in his lumbar spine and had normal reflexes in his lower extremities. (R. at 79.) Plaintiff complained of numbness, weakness and loss of sensation in January and April 2014, but he displayed "normal 5/5 strength" during his April 2014 physical examination. (R. at 80.) That same month, Plaintiff underwent a cervical discectomy and fusion and subsequently reported "no arm pain, sensory changes, or weakness." (R. at 80.) In May 2014, Plaintiff displayed good strength and sensation

14

in both the upper and lower extremities, and an x-ray of Plaintiff's cervical spine looked normal.
(R. at 81.) Although Plaintiff reported experiencing numbness and pain in September 2014, he
displayed normal strength during a physical examination. (R. at 81.) In December 2015,
Plaintiff again complained of "numbness, tingling and pain in his right side[,]" but physical
examination revealed tenderness in the cervical spine at C4 only, with otherwise unremarkable
results. (R. at 81 (noting that Plaintiff "was neurologically intact").) Although the ALJ
discussed the medical evidence in the RFC assessment — rather than at step three — the ALJ
only needed to discuss the medical evidence once. *McCartney*, 28 F. App'x. at 279-80. Thus,
the ALJ satisfied his duty to explain his step three findings. Moreover, substantial evidence —
including Plaintiff's medical records and the opinions of the state agency physicians — supports
the ALJ's step three finding.

### a. Plaintiff's medical records show that Plaintiff did not satisfy all of the requirements of Listing 1.04A.

Plaintiff relies on instances in the record showing that he experienced pain, weakness,
tenderness and loss of sensation to establish that he satisfies the criteria for Listing 1.04A, but
complete review of the medical records considered by the ALJ and Appeals Council reveal that
Plaintiff did not suffer from the requisite motor, sensory or reflex loss under Listing 1.04A.
(Pl.'s Mem. at 9-13.)

On August 8, 2013, Plaintiff presented to CSC Hospital, complaining of back pain. (R. at
442.) Plaintiff experienced tenderness in his lower back, displayed a decreased range of motion
of the back secondary to pain and had positive straight leg raise test results bilaterally. (R. at
445.) But Plaintiff displayed a normal range of motion in his other extremities and full range of
motion in his neck. (R. at 445.) He also experienced normal sensation in his lower extremities
bilaterally and moved all extremities "with good strength and coordination." (R. at 445.) An x-

ray of Plaintiff's lumbar spine revealed no fracture, subluxation or destructive lesion; and, the disc spaces appeared "essentially normal." (R. at 446-47.) Dr. Sessums diagnosed Plaintiff with lumbar spine strain and lumbosacral radiculopathy. (R. at 447.) Dr. Sessums described Plaintiff's condition as "stable" and "good" upon discharge. (R. at 447-48.) She instructed Plaintiff to follow-up with John Andrew Kona, M.D., in three to four days. (R. at 448.) Dr. Sessums also instructed Plaintiff to avoid heavy lifting until his follow-up examination. (R. at 448.) The record contains no evidence that Plaintiff followed up with Dr. Kona.

On December 17, 2013, Plaintiff presented to Adam C. Godsey, M.D., at UVA Health Systems, complaining of low back pain, radiating to his thigh and down his leg. (R. at 461.) Plaintiff stated that his pain had worsened in the past two to three months. (R. at 461.) Plaintiff denied experiencing relief from medication, but also said that he "tries to avoid medications as much as possible." (R. at 461.) Although Plaintiff had positive straight leg raise test results due to pain and experienced numbness on the right side, Dr. Godsey observed no tenderness to palpitation over the lumbar spine. (R. at 463.) On physical examination, Plaintiff displayed normal reflexes in his lower extremities. (R. at 463.) Dr. Godsey diagnosed Plaintiff with lumbar disc disease, but noted "no red flag symptoms," and he prescribed Naproxen and Gabapentin for Plaintiff's low back pain. (R. at 463.)

On January 29, 2014, Plaintiff presented to Kimberly Skinner, PA-C, at UVA Health Systems, complaining of pain in his lower back, numbness in his right side, weakness and gait instability. (R. at 465-69.) In her progress notes, Skinner described Plaintiff's history of low back pain and the results from a 2010 MRI showing that Plaintiff had "a small disc bulge at L4-5." (R. at 469.) Plaintiff's treatment providers had prescribed "conservative treatment with physical therapy and epidural steroid injections," but Plaintiff told Skinner that he had not sought

16

such treatment since 2010. (R. at 469.)  On physical examination, Plaintiff demonstrated "good strength in his upper extremities" and, despite some "mild hip flexor weakness on the right side," Plaintiff displayed 5/5 strength in his lower extremities. (R. at 469.)  He experienced decreased sensation on the right side, but had good sensation on the left side in both his upper and lower extremities. (R. at 469.)  Plaintiff walked with an antalgic gait and ambulated with a cane. (R. at 469.)  Skinner ordered a follow-up MRI. (R. at 469.)

Plaintiff returned to UVA Health Systems on February 4, 2014, for an MRI of the thoracic and lumbar spine. (R. at 477-78.)  David Joyner, M.D., and David. A. Ornan, M.D., observed degenerative changes on the lumbar spinal canal, including mild spinal canal stenosis at L3-4 and foraminal stenoses most prominent at L4-5 and L5-S1. (R. at 478.)  Drs. Joyner and Ornan also observed "moderate to severe spinal canal stenosis at C6-C7 secondary to disc protrusion/disc osteophyte complex and questionable abnormal signal in the cervical spinal cord." (R. at 478.)  Finally, Drs. Joyner and Ornan observed no disc herniation, spinal canal or foraminal stenosis in the thoracic spine. (R. at 478.)  Plaintiff had a follow-up MRI of the cervical spine on February 27, 2014. (R. at 520.)  Erin McCrum, M.D., and David Abdullah, M.D., observed the following:  disc bulges at C3-C4 and C6-C7 showing cord volume loss consistent with myelomalacia; increased central cord T2W1 signal extending from C7 to T1; and, central canal and neural foraminal stenosis. (R. at 520.)

On April 14, 2014, Plaintiff presented to Dr. Helm, whom Plaintiff had previously seen in 2010, at UVA Health Systems. (R. at 542.)  Dr. Helm performed an anterior cervical discectomy and fusion procedure to treat Plaintiff's cervical stenosis with cord compression and cord edema. (R. at 542, 562.)  During the procedure, Dr. Helm found that Plaintiff suffered from a herniated disc causing pathology compression of the cervical spine. (R. at 543.)  Sze Chun Winson Ho,

17

M.D., described Plaintiff's spinal cord as "thoroughly decompressed" after the discectomy. (R. at 563.) Post-operative notes also describe Plaintiff's condition as stable, although he experienced some residual numbness in his right leg. (R. at 543.) The day after his surgery, Chad Aldridge, P.T., visited Plaintiff to determine whether he required further inpatient services. (R. at 543, 549.) Aldridge noted improvement in Plaintiff's condition since the previous day and observed Plaintiff ambulate and climb stairs using a cane. (R. at 550.) Pain did not interfere with Plaintiff's physical therapy session. (R. at 550.) Plaintiff reported that he felt better and that the sensation in his right leg continued to improve. (R. at 550.) Plaintiff also reported improved sensation in his right leg to the on-call occupational therapist. (R. at 552.) Aldridge assessed that Plaintiff would benefit from outpatient physical therapy, but noted that Plaintiff "ha[d] no acute [physical therapy] needs" and could return home. (R. at 550.) Plaintiff's discharge instructions called for activity "as tolerated." (R. at 662.)

Plaintiff had several postoperative phone calls with treating staff at UVA Health Systems. About a week after his surgery, Plaintiff called Natalie B. Krovetz, R.N., complaining that he had not had a bowel movement since his surgery. (R. at 700.) Nurse Krovetz discussed laxative options with Plaintiff but noted that Plaintiff was "[o]therwise doing fairly well." (R. at 700.) On April 23, 2014, Plaintiff called Nurse Krovetz again, requesting a refill of his pain medication and complaining of neck pain when changing position. (R. at 700.) Plaintiff reported no arm pain, sensory changes or weakness. (R. at 700.) On April 29, 2014, Plaintiff called again, inquiring as to whether he should continue taking Gabapentin. (R. at 699.) Plaintiff told a nurse that he felt tingling in his right knee cap, which ran down his leg to his foot. (R. at 699.) He requested a higher dosage of Gabapentin. (R. at 699.) The next day, Dr. Godsey faxed Plaintiff a prescription for Gabapentin to treat his pain. (R. at 698.) On May 14, 2014, Plaintiff called

18

Nurse Krovetz complaining of upper arm pain. (R. at 697.) Plaintiff stated that he could not afford physical therapy or the $6 copay for his Gabapentin. (R. at 697.) Nurse Krovetz advised Plaintiff to use his collar as needed and to "take it easy" until his next appointment. (R. at 697.)

On May 28, 2014, Plaintiff returned to Skinner for a follow-up appointment. (R. at 668.) Although Plaintiff experienced some numbness and tingling in his right lower extremity, he reported that the numbness on his right side had improved post-surgery. (R. at 668-69.) He also reported experiencing significant pain in his left tricep. (R. at 669.) On physical examination, Plaintiff appeared in no acute distress and displayed good strength and sensation in both his upper and lower extremities. (R. at 669.) Skinner described Plaintiff's anterior cervical incision as "well healed without evidence of infection or complication." (R. at 669.) Skinner had additional radiographs taken of Plaintiff's cervical spine. (R. at 673.) Manal Nicolas-Jilwan, M.D., observed "postoperative changes C3-C4 and C6-C7 ACDF, without interval complications," and he described Plaintiff's vertebral body heights and degenerative changes as stable. (R. at 673.) Skinner diagnosed Plaintiff with cervical stenosis of the spine, prescribed Gabapentin for his pain and instructed Plaintiff to contact Skinner's office if he had persistent left upper extremity pain. (R. at 669, 672.)

On September 16, 2014, Plaintiff returned to Dr. Helm, complaining of increasing numbness in his right flank and right leg and pain in his low back, leg and in the triceps region of his left arm. (R. at 692.) On physical examination, Plaintiff experienced some numbness in his right leg, but Dr. Helm noted that Plaintiff "[was] not myelopathic." (R. at 692.) Plaintiff also displayed normal strength. (R. at 692.) Dr. Helm increased Plaintiff's Neurontin dosage and instructed Plaintiff to schedule a cervical and lumbar CT scan/myelogram. (R. at 692.) Treating staff also advised Plaintiff that treatment for his spine could prove more effective if he quit

19

smoking. (R. at 693.)  On October 20, 2014, Plaintiff's wife informed Nurse Krovetz that Plaintiff could not afford to have the cervical and lumbar CT/myelogram, because he had no insurance and could not make payments while he "await[ed] disability." (R. at 692.)  Nurse Krovetz asked Plaintiff's wife to contact UVA Health Systems if anything changed, so that they could schedule Plaintiff's study. (R. at 692.)

Plaintiff did not seek treatment again until June 2, 2015, when he returned to Dr. Helm, complaining of continued neck pain and significant numbness and weakness in his right leg. (R. at 738.)  Plaintiff displayed "some weakness of dorsiflexion on the right side, as well as some numbness in the L5 distribution on the right side." (R. at 738.)  Dr. Helm again recommended a cervical and lumbar CT scan/myelogram and decided to "keep [Plaintiff] off work for two months[,]" while Plaintiff obtained a functional capacity evaluation. (R. at 738.)  On June 9, 2015, treating staff at UVA Health Systems took additional scans of Plaintiff's cervical and lumbar spine, which revealed the following:  Plaintiff's cervical spine showed postsurgical changes of C3-C4 and C6-C7 ACDF with partial fusion of the disc spaces, but no evidence of hardware complication; multilevel central canal stenosis (mild to moderate with cord atrophy at C3-C4 and C6-C7); and, multilevel neuroforaminal stenosis (severe at C3-C4 on the right). (R. at 740-43.)  Plaintiff's lumbar spine showed no significant central canal stenosis; multilevel neuroforaminal stenosis (moderate at L4-L5); and, mild disc degeneration from T9-T10 to T11-T12. (R. at 743.)  The record lacks evidence that Plaintiff sought follow-up treatment during the months following those scans.

On December 28, 2015, Plaintiff presented to the emergency department at CSC Hospital, complaining of weakness, as well as numbness and tingling in his right side that began to bother him two days before his visit. (R. at 723.)  Plaintiff described his neck pain as ongoing,

and he told treating staff that he had not felt better since his cervical spine surgery in August

2014. (R. at 723, 725.) Benjamin D. Wallace, D.O., conducted Plaintiff's physical examination

and noted no tenderness in Plaintiff's neck or back. (R. at 725.) Although Plaintiff displayed 4/5

strength in his right upper and lower extremities, reduced (1/4) patellar reflexes and tenderness in

the cervical spine, he had grossly intact sensory functioning. (R. at 725.) James Hall, Jr., M.D.,

reviewed an MRI of Plaintiff's cervical spine and described Plaintiff's spinal cord as having an

abnormal appearance, including flattening of the spinal cord at C2-C3. (R. at 732-33.) Dr.

Wallace's treatment notes showed "some mild compression." (R. at 728.) Dr. Wallace sought

further consultation from the neurosurgery department regarding Plaintiff's MRI, and they found

that "no acute intervention [was] required." (R. at 728-29.) Plaintiff left the hospital early

against medical advice. (R. at 729.) Plaintiff's discharge plan described his condition as stable

and instructed him to follow-up with neurosurgery, but he failed to do so. (R. at 729, 759.)

On January 21, 2016, Plaintiff presented to Christianne P. McLean, M.D., at Centra

Medical Group ("CMG"), complaining of right lower back pain radiating down his leg and

tingling through his right hip to his toes. (R. at 759.) Plaintiff stated that the pain and tingling

began two days earlier. (R. at 759.) He reported experiencing some benefits from Duloxetine,

but had not been taking that medication daily due to financial constraints. (R. at 759.) Plaintiff

also experienced some pain relief from Extra-Strength Tylenol, which Plaintiff reported taking

three times daily. (R. at 759.) Dr. McLean described Plaintiff's cranial nerves as "grossly

intact." (R. at 760.) Plaintiff displayed an antalgic gait and used a cane to ambulate, but he had

5/5 strength in his left lower extremities and 4/5 strength in is right lower extremities. (R. at

760.) Dr. McLean noted that Plaintiff's lumbar film showed some minimal degenerative change,

with "some very small anterolateral osteophytes at L2-3 and L3-L4[,]" with no compression

21

fracture or other acute abnormality. (R. at 760.) Dr. McLean prescribed Prednisone and Robaxin and instructed Plaintiff to follow-up with a specialist. (R. at 760.) Treating staff coordinated Plaintiff's follow-up appointment with the neurology specialist. (R. at 761.) On February 9, 2016, Plaintiff returned to CMG, complaining of back pain. (R. at 756.) He reported missing his follow-up appointment with the neurology specialist due to weather, but claimed to have rescheduled and requested a refill of his medication in the meantime. (R. at 756.)

On March 2, 2016, Plaintiff presented to Dr. McLean, complaining of back pain and requesting refills of his medication. (R. at 764.) Plaintiff stated that medication helped his pain and reported feeling better overall. (R. at 764.) Dr. McLean observed no neck stiffness, joint pain or muscle cramps, but Plaintiff experienced back pain and numbness in his right leg. (R. at 772.) Although Plaintiff displayed an antalgic gate, he ambulated without his cane. (R. at 764, 773.) Dr. McLean described Plaintiff's cranial nerves as "grossly intact." (R. at 773.) Plaintiff displayed good muscle strength in his upper and lower extremities. (R. at 773.) Dr. McLean noted that Plaintiff continued to smoke a half-pack of cigarettes per day, failed to follow-up with neurosurgery and did not routinely take his medication as directed due to financial constraints. (R. at 764.)[3]

---

[3]  During the hearing, Plaintiff requested that the ALJ leave the record open for receipt of additional medical records. (R. at 95.) Because Plaintiff's attorney failed to seek a subpoena despite ample opportunity to do so before the November 2015 hearing, the ALJ refused Plaintiff's request, and Plaintiff objected. (R. at 95-97.) Though the ALJ refused to accept the evidence at the hearing, the Appeals Council specifically considered Plaintiff's medical records through March 2, 2016 — the date of the ALJ's decision — and held that the additional records did not "provide a basis for changing the [ALJ's] decision." (R. at 2.)

Because Plaintiff suffered from lower back pain, (R. at 445, 461, 463, 465, 469, 759), Listing 1.04A requires Plaintiff to show that his impairments produced positive results of the straight-leg raising test in both the sitting and supine positions. Plaintiff produced positive straight-leg raising test results once in August 2013 with Dr. Sessums and again in December 2013 with Dr. Godsey. (R. at 445, 463.) Neither doctor specified whether they performed the test in the sitting or supine position, and Listing 1.04A requires positive results in both positions. *See Parker v. Colvin*, 2015 WL 5793695, at *14 (E.D. Va. Sept. 29, 2015), *report and recommendation adopted*, at *1 (lack of evidence showing that plaintiff produced straight-leg raising tests in both positions supported ALJ's finding that plaintiff did not satisfy Listing 1.04A); *see also Cowin v. Colvin*, 2016 WL 11201440, at *12 (D.S.C. Oct. 25, 2016), *report and recommendation adopted sub nom. Cowin v. Berryhill*, 2017 WL 710542 (D.S.C. Feb. 23, 2017) (same).

Plaintiff's medical records first show evidence of nerve root compression in February 2014. (*See* R. at 478 (MRI showing "abnormal signal in the cervical spinal cord").) Plaintiff underwent surgery in April 2014 to treat his cervical stenosis with cord compression. (R. at 543.) Post-surgery, Plaintiff reported improvement in the numbness on his right side. (R. at 550, 552, 668-69, 700.) In May 2014, Plaintiff displayed normal strength and sensation in both his upper and lower extremities. (R. at 669.) Plaintiff complained of numbness to Dr. Helm in September 2014, but Dr. Helm described Plaintiff's numbness as *not* myelopathic.[4] (R. at 692.) Otherwise, Plaintiff displayed normal strength. (R. at 692.) When Plaintiff returned to Dr. Helm in June 2014, complaining of neck pain and significant numbness and weakness on his right side,

---

[4]     Myelopathy relates to "various functional disturbances or pathological changes in the spinal cord." *Myelopathy*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

Dr. Helm only placed Plaintiff on a temporary, two-month work restriction. (R. at 738.)

Plaintiff's self-reported improvement, (R. at 550, 552, 668-69, 700), his display of normal

strength and sensation on physical examination, (R. at 692, 669), and the temporary nature of Dr.

Helm's work restriction, (R. at 738), further support the ALJ's finding that Plaintiff did not

satisfy Listing 1.04A, because Plaintiff's condition did not last or was not expected to last for at

least twelve months. (R. at 77); 20 C.F.R. §§ 404.1509; 416.909.

Plaintiff's December 2015 MRI of the cervical spine showed "some mild compression,"

but the neurosurgery department at CSC Hospital determined that Plaintiff's condition required

no acute intervention. (R. at 728-29.) During his December 2015 visit, Plaintiff displayed

slightly reduced (4/5) strength in his right extremities and reduced patellar reflexes, but he

exhibited grossly intact sensory functioning. (R. at 725.) In January 2016, Plaintiff again

complained of lower back pain and numbness and tingling in his right side, but he displayed 5/5

strength in left lower extremities, 4/5 strength in his right lower extremities and "grossly intact"

cranial nerves. (R. at 760.) Plaintiff reported some pain relief with medication. (R. at 759.) By

March 2016, Plaintiff reported that medication improved his pain and stated that he felt better

overall, despite continued complaints of pain and numbness. (R. at 764.) Plaintiff displayed

grossly intact cranial nerves and good muscle strength in all of his extremities. (R. at 773.)

These records show that Plaintiff lacked the requisite motor loss and straight-leg raising test

results in both the sitting and supine positions; and thus, support the ALJ's finding that Plaintiff

did not satisfy the criteria for Listing 1.04A.

### b. The State Agency Physicians' Opinions Support the ALJ's Finding that Plaintiff Did Not Satisfy Listing 1.04A.

The ALJ also noted that the state agency physicians found that Plaintiff did not meet or

medically equal the criteria set forth in Listing 1.04A. (R. at 77.) State agency medical

consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. §§ 404.1513a(b)(1), 416.913a(b)(1).

On December 11, 2013, Dr. Cole reviewed Plaintiff's medical evidence and opined that Plaintiff could occasionally climb ladders, ropes and scaffolds, and frequently stoop, kneel, crouch and crawl. (R. at 145.) Dr. Cole placed no limitations on Plaintiff's ability to climb ramps and stairs or balance, found no manipulative, visual, communicative or environmental limitations, and opined that Plaintiff could perform light work. (R. at 145.)

On July 24, 2014, Dr. Howard reviewed Plaintiff's updated medical records and found Plaintiff subject to additional limitations. (R. at 168.) While Dr. Howard found no manipulative, visual, communicative or environmental limitations, she opined that Plaintiff could frequently climb ramps and stairs, occasionally climb ladders, ropes and scaffolds, and frequently stoop, kneel, crouch or crawl. (R. at 168.) Dr. Howard also found Plaintiff capable of light work. (R. at 169.) She described Plaintiff's condition as "currently severe," but "expected to improve," and "not expected to remain severe enough for 12 months in a row to keep [Plaintiff] from working." (R. at 170.)

The ALJ afforded partial weight to Dr. Cole's opinion and great weight to Dr. Howard's opinion. (R. at 83.) The ALJ described these opinions as balanced, objective and consistent with the record evidence. (R. at 83.) Both Dr. Cole and Dr. Howard opined that Plaintiff's limitations would not remain severe enough to preclude Plaintiff from working. (R. at 148, 170.) The record shows that Plaintiff's complaints of numbness improved after he underwent a cervical discectomy and his pain improved with medication. (R. at 550, 552, 668-69, 700, 759, 764.)

25

Despite complaints of pain, weakness and numbness, Plaintiff also displayed normal strength and intact sensation during physical examination. (R. at 445, 689, 692.) These findings support Drs. Cole and Howard's opinions, as well as the ALJ's reliance on the state agency physicians' opinions at step three.

In *Fox v. Colvin*, the Fourth Circuit vacated and remanded, because the ALJ failed to address conflicting evidence and explain the basis for his step three findings. 632 F. App'x 750, 755 (4th Cir. 2015) (citing *Mascio*, 780 F.3d at 638; *Radford*, 734 F.3d at 296) ("Inconsistent evidence abounds, and yet the ALJ 'leaves us to wonder' in such a way that we cannot conduct 'meaningful review.'"). Unlike the ALJ in *Fox*, the ALJ here addressed the inconsistencies in the record in the RFC assessment; and, at step three, the ALJ relied on the fact that no treating or examining physician found that Plaintiff met or equaled Listing 1.04. (R. at 77, 80-81.) Indeed, Dr. Sessums and Dr. Helm provided Plaintiff with temporary work restrictions, but issued no opinion that Plaintiff satisfied Listing 1.04A. (R. at 447-48, 738.) The state agency physicians found that Plaintiff did not satisfy the listing. (R. at 77, 154-55, 169-70.) Thus, substantial evidence supports the ALJ's decision that Plaintiff did not satisfy the criteria of Listing 1.04A.

### 3. Substantial Evidence Supports the RFC.

Next, Plaintiff argues that the ALJ failed to conduct a function-by-function analysis before assessing Plaintiff's RFC, thereby failing to consider the combination of Plaintiff's impairments, including Plaintiff's use of a cane and difficulty with walking, balancing and using his hands. (Pl.'s Mem. at 19-20.) Defendant argues that substantial evidence supports the RFC, despite the lack of an explicit function-by-function analysis. (Def.'s Mem. at 32.)

After step three of the sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20

C.F.R. §§ 404.1502(e)-(t), 404.1545(a)(1), 416.902(e)-(t), 416.945(a)(1). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of a claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. §§ 404.1545(b), 416.945(b). Generally, the claimant shoulders the responsibility for providing the evidence that the ALJ utilizes in making his RFC determination; however, before determining that a claimant does not have a disability, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record, as well as those impairments based on the claimant's credible complaints. *Carter v. Astrue,* 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011); *accord* 20 C.F.R. §§ 404.1545(e), 416.945(e).

Social Security Ruling 96-8p instructs that the RFC "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Mascio v. Colvin,* 780 F.3d 632, 636 (4th Cir. 2015) (citing SSR 96-8p). The Ruling further explains that the RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (citing SSR 96-8p).

The ALJ's failure to conduct a function-by-function analysis does not necessarily result in remand. The Fourth Circuit rejected a *"per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." *Mascio,* 780 F.3d at 636. Indeed, in light of *Mascio,* at least three district courts have found that in the absence of an explicit function-by-function analysis, the reviewing court "must assess whether the ALJ's

27

RFC analysis considered the relevant functions, whether his decision provides a sufficient basis to review his conclusions, and, ultimately, whether substantial evidence in the record supports that decision." *Ashby v. Colvin,* 2015 WL 1481625, at *3, *7 (S.D. W. Va. March 31, 2015) (holding that ALJ did not conduct explicit function-by-function analysis of claimant's physical abilities, but sufficient evidence existed showing that ALJ analyzed the relevant function); *see also Scruggs v. Colvin,* 2015 WL 2250890, at *4-5 (W.D.N.C. May 13, 2015) (requiring remand because ALJ's decision did not address claimant's ability to complete tasks for a full workday); *Carver v. Colvin,* 2015 WL 4077466, at *10 (M.D.N.C. July 6, 2015) (recommending remand because ALJ neglected to assess claimant's ability to walk or stand for a full workday).

Here, the ALJ did not perform an explicit function-by-function analysis. However, after reviewing the entire record, including Plaintiff's medical records, Plaintiff's testimony and subjective complaints, the third-party function report of Plaintiff's spouse and the state agency physicians' opinions, the ALJ concluded that Plaintiff could perform light work, except that he could frequently climb ramps and stairs, occasionally climb ladders, ropes and scaffolds, and frequently balance, stoop, kneel, crouch and crawl. (R. at 77-84.)

### a.   Plaintiff's use of a cane, difficulty walking and balancing limitations.

The ALJ noted that Plaintiff reported difficulty walking long distances and used a non-prescribed walking cane,[5] as well as the fact that Plaintiff felt "off balance," experienced gait instability, and walked with an antalgic or ataxic gait during appointments with Skinner. (R. at 78-80.) The ALJ discussed that Plaintiff experienced numbness, tingling and decreased

---

[5]      Plaintiff testified that he used a prescribed cane, which the ALJ noted in his opinion as well, but the record stands devoid of evidence that any medical provider prescribed a cane for Plaintiff or otherwise found that he medically required a cane. (R. at 79, 107.)

sensation, but those records involved Plaintiff's upper and/or lower extremities generally.  (R. at 80.)  Following Plaintiff's 2014 surgery, the ALJ noted that Plaintiff experienced improvement in his right-sided flank numbness and had no arm pain or sensory changes.  (R. at 80.)

Plaintiff's medical records show that he displayed an antalgic gait and often used a cane to ambulate.  (R. at 469, 550, 759, 764.)  But the record lacks any evidence that Plaintiff medically required a cane, despite his testimony that "the lady at MCV" prescribed a cane to Plaintiff in 2014 or 2015.  (R. at 107.)  While use of a hand-held assistive device may affect an individual's RFC by limiting his ability to lift, carry, push and pull, the ALJ need only consider "medically required" assistive walking devices when formulating the RFC.  SSR 96-9p; *Fletcher v. Colvin*, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015) (citing 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.00(J)(4)).  To establish a medical requirement, the claimant must present medical documentation that (1) supports his need for an assistive walking device, and (2) describes the circumstances that require it.  *Fletcher*, 2015 WL 4506699, at *8.  Here, Plaintiff provided no such medical documentation (e.g., a prescription or note from a treatment provider); therefore, the ALJ did not need to include such a limitation in the RFC.  *Id.*

During a physical therapy session the day after Plaintiff's 2014 surgery, Plaintiff used a cane to ambulate, stand and climb stairs.  (R. at 553.)  The occupational therapist that evaluated Plaintiff post-surgery also noted that he used a cane to balance and completed functional transfers and activities of daily living with standby assistance.  (R. at 553.)  Plaintiff reported to both the physical and occupational therapists that he used a cane at home and had a history of falls, but Plaintiff stated that his most recent fall occurred more than six months before the April 2014 surgery.  (R. at 553-56.)  Upon discharge, the occupational therapist anticipated that Plaintiff had "no further [occupational therapy] needs."  (R. at 554.)

Following the surgery, Plaintiff's treatment notes make no mention of cane use during appointments in May 2014, September 2014 or June 2015, nor does the record reflect that Plaintiff used a cane when he presented to CSC Hospital in December 2015. (R. at 668, 692, 723-24, 738.) Plaintiff used a cane to ambulate during one appointment in January 2016. (R. at 759-60.) However, on March 2, 2016 — the date of the ALJ's decision — Plaintiff displayed an antalgic gait, but walked without his cane, because he was "having a better day." (R. at 764.) In addition to this improvement, Plaintiff displayed normal strength in August 2013, January 2014, May 2014, September 2014 and March 2016. (R. at 445, 469, 692, 669, 773.) Lastly, Dr. Howard — the state agency physician whose opinion the ALJ afforded great weight — noted that Plaintiff used an assistive device since his April 2014 surgery, but opined that Plaintiff's condition would improve and that he retained the ability to perform light work, with additional limitations, including occasional climbing of ladders, ropes and scaffolds, frequent balancing and frequent climbing of ramps and stairs.[6] (R. at 83, 178-183.)

### b. Plaintiff's difficulty using his hands.

The medical records before the ALJ and incorporated into the record by the Appeals Council show that Plaintiff experienced numbness and tingling, but those findings usually referenced Plaintiff's lower extremities and never specified problems with Plaintiff's hands. (R. at 465, 692, 723, 738.) Moreover, Plaintiff reported improvement in feelings of numbness

---

[6]     Additionally, Plaintiff alleges that the ALJ failed to account for a limitation in Plaintiff's ability to sit and stand. (Pl.'s Mem. at 20, 22.) Plaintiff testified that he could only sit or stand for a few minutes at a time and his spouse reported that he experienced difficulty sitting and standing as well. (R. at 108-09, 391.) But the medical records reviewed by the ALJ and incorporated into the record by the Appeals Council fail to substantiate these alleged limitations. In his opinion, the ALJ noted the subjective reports of Plaintiff and his spouse regarding Plaintiff's ability to sit and stand, and discounted the credibility of those statements for the reasons explained below. (R. at 78-82.)

following his 2014 surgery. (R. at 550, 552, 668-69, 700.) Although Plaintiff testified that he had difficulty with buttons and opening cans, his physical therapy notes following the 2014 surgery reflect that Plaintiff only needed help dressing his lower body, and described Plaintiff as "independent" in the areas of grooming, feeding and using the toilet. (R. at 115-16, 553.) Further, neither state agency physician opined that Plaintiff had any manipulative limitations. (R. at 145, 168.) The lack of record evidence showing that Plaintiff struggled with use of his hands supports the ALJ's decision to exclude any manipulative limitations from Plaintiff's RFC.

Accordingly, the ALJ's lack of an explicit function-by-function analysis does not require remand, because the RFC analysis sufficiently considered and discussed Plaintiff's use of a cane, difficulty balancing and walking and his alleged manipulative limitations. Moreover, substantial evidence supports the RFC.

### 4. Substantial Evidence Supports the ALJ's Credibility Assessment.

Next, Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility. (Pl.'s Mem. at 22-29.) Specifically, Plaintiff asserts that the ALJ "marred" Plaintiff's credibility determination by misstating the record, cherry picking facts and failing to explain "why any of [the ALJ's] relied upon facts discredited . . . [P]laintiff's statements concerning the severity of his pain." (Pl.'s Mem. at 22-29.) Defendant responds that substantial evidence supports the credibility determination. (Def.'s Mem. at 34-36.)

The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. §§ 404.1529(a) and 416.929(a); SSR 96-7p.

31

The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5 n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Id.* at 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th

Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Here, the ALJ satisfied the two-step evaluation process set forth in *Craig*. First, the ALJ concluded that Plaintiff's medically determinable impairment could reasonably cause Plaintiff's alleged symptoms. (R. at 81.) Then, "after careful consideration of the evidence," the ALJ reasoned that Plaintiff's statements regarding the intensity, persistence and limiting effects of Plaintiff's pain "[were] not entirely credible." (R. at 81.) Specifically, the ALJ found that Plaintiff's treatment record — including mostly normal spinal x-rays and MRIs from August 2013, February 2014 and April 2014 — did not support the alleged severity of Plaintiff's symptoms. (R. at 81.) The ALJ also noted that during the days following Plaintiff's 2014 surgery, he could "complete transfers, ambulation, and stairs," independently groomed and fed himself, and used the bathroom without assistance. (R. at 81.) The ALJ further relied on inconsistencies between Plaintiff's testimony and his spouse's third-party function report, Plaintiff's history of conservative treatment and his failure to remain compliant with prescribed medication to conclude that Plaintiff's "reasonably good health" and "relatively benign physical examinations belie [Plaintiff's] allegations of disabling symptoms or functional limitations." (R. at 81-82.) Substantial evidence supports the ALJ's decision.

Plaintiff reported suffering from lower-back pain that radiated down his legs and toes in a September 2013 pain questionnaire. (R. at 323-24.) He stated that pain limited his ability to work, but reported that medication improved his pain and it did not cause any side effects. (R. at 324.) Plaintiff's spouse reported that Plaintiff could not walk long distances, bend over, stand

for a long period of time or "do any lifting" in her August 2014 third-party function report. (R. at 391.) Although Plaintiff required some help bathing, Plaintiff's spouse reported that he did not need assistance getting dressed, bathing, caring for his hair, shaving or feeding himself. (R. at 391.) Plaintiff's spouse stated that he used a cane, held on to furniture and needed his wife's help to get to the bathroom. (R. at 391.) Plaintiff's spouse reported that Plaintiff could not lift, walk, sit, climb stairs, kneel, squat, reach or bend his hands due to nerve damage, but Plaintiff could walk about 100 feet before needing to rest and ambulated with a cane. (R. at 397.)

During the hearing before the ALJ, Plaintiff testified that he could sit and stand for five to six minutes, walk eight to nine yards and lift five to eight pounds. (R. at 108-09, 116.) Plaintiff stated that he could not lift his arms above his head, elevated his feet twice per day for two hours at a time and could not wash dishes, do laundry, feed the dog, mow the lawn or use buttons or a can opener. (R. at 110, 114-17.) If Plaintiff went shopping, he stated that he used a motorized grocery cart, but he did not drive a car. (R. at 110, 119.) Plaintiff testified that cold weather made "everything numb," and that he could not leave the house for three to four days per month due to feelings of numbness. (R. at 119-20.) Plaintiff testified that his severe back and neck pain and numbness prevented him from working. (R. at 120-21.)

The ALJ acknowledged Plaintiff's testimony and subjective complaints, but ultimately found that the alleged severity of Plaintiff's symptoms did not comport with Plaintiff's medical records. (R. at 81.) Indeed, as the ALJ noted, Plaintiff's x-ray of the lumbar spine from April 2013 did not reveal any remarkable findings. (R. at 81, 450.) Although Plaintiff's February 2014 MRI of the thoracic spine showed degenerative changes and signs of cervical stenosis, imaging of his thoracic spine showed no disc herniation, spinal canal or foraminal stenosis. (R. at 478.) During a physical therapy session the day after Plaintiff's April 2014 cervical

34

discectomy, Plaintiff successfully completed functional transfers, climbed stairs and performed activities of daily living — including grooming and feeding himself and going to the bathroom. (R. at 553.)  Although Plaintiff used a cane during the physical therapy session, the physical therapist noted that pain did not interfere with Plaintiff's performance.  (R. at 550.)  Plaintiff reported improvement in the numbness on his right side post-surgery and his May 2014 x-ray of the cervical spine revealed unremarkable findings.  (R. at 550, 552, 668-69, 678, 700.)  Although Plaintiff's December 2015 MRI showed "flattening of the cervical spinal cord" at C2-C3 and some mild compression, treating staff at CSC Hospital determined that Plaintiff's scans required "no acute intervention."  (R. at 728-29, 732-33.)  Moreover, Plaintiff's medical records spanning from August 2013 through the date of the ALJ's decision show that he ambulated using a cane, (R. at 469, 550, 759, 764), but frequently displayed normal strength on physical examination, despite complaints of pain and numbness.  (R. at 445, 469, 669, 692, 773.)

Plaintiff argues that the ALJ improperly relied on the third-party function report completed by Plaintiff's spouse to discount Plaintiff's credibility, because the ALJ afforded very limited weight to the spouse's statements.  (Pl.'s Mem. at 26-27.)  Social Security Ruling 96-7p provides that "other sources," such as a claimant's family members or friends, "may provide information from which inferences and conclusions may be drawn about the credibility of the individual's statements."  SSR 96-7p.[7]  Here, the ALJ pointed to inconsistencies between the

---

[7]     Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p.  Plaintiff filed his claims in July 2013, before this regulation took effect.  (R. at 74, 256, 266.)  The Agency does not have the power to engage in retroactive rulemaking.  *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, the Court will review the ALJ's decision under SSR 96-7p.

spouse's statements and Plaintiff's reported functional abilities to "suggest that the information

provided by [Plaintiff] . . . may not be entirely reliable." (R. at 81.) For example, while

Plaintiff's spouse reported that Plaintiff had no issues handling money, could follow instructions

"very well" and could walk about 100 feet, Plaintiff stated the opposite — that he could not

manage money, struggled to follow instructions and could not walk "far at all!" (R. at 81, 317-

19, 394-96.) Ultimately, the ALJ gave the spouse's statements very limited weight, because the

spouse did not constitute a medical or professional source; thus, her statements could not

"outweigh the fair and balanced assessment by the [s]tate agency disability physicians who had

reviewed all of the medical records." (R. at 83.) However, affording Plaintiff's spouse — a non-

medical, non-professional source — only limited weight in no way prevented the ALJ from

acknowledging the inconsistencies between the statements provided by Plaintiff and his spouse

in making a credibility determination. Thus, Plaintiff's argument lacks merit.

Next, the ALJ relied on Plaintiff's history of conservative treatment and non-compliance

with prescribed medication and treatment to discount Plaintiff's credibility. (R. at 81-82.)

Under the regulations, an ALJ will consider the medications and treatments used to alleviate a

claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v). If the

claimant requires only conservative treatment, an ALJ is reasonable in holding that the alleged

disability lacks the seriousness that the claimant alleges. *Dunn*, 607 F. App'x at 274-75.

Similarly, noncompliance with a treatment regimen can indicate a claimant's lack of credibility

as to the severity of his alleged symptoms as well. *Id.* at 275-76.

Regarding the conservative nature of Plaintiff's treatment, the record reflects that no

doctor recommended additional surgery after Plaintiff's April 2014 discectomy and fusion. As

the ALJ noted, Plaintiff's care providers predominantly treated his symptoms with medication, which improved Plaintiff's pain.  (R. at 82, 323, 469, 662, 759, 764, 773.)

As for Plaintiff's noncompliance, the ALJ noted Plaintiff's marijuana and alcohol use and his failure to take Gabapentin as prescribed.  (R. at 82.)  In the two instances cited by the ALJ, Plaintiff reported he did not take his medication, because he could not afford it.  (R. at 82 (citing R. at 695, 697).)  The Fourth Circuit has held that "[a] claimant may not be penalized for failing to seek treatment []he cannot afford," because "'[i]t flies in the face of the patent purposes of the Social Security Act to deny benefits to someone . . . too poor to obtain medical treatment that may help him.'" *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir.1984)).  However, "*Lovejoy* and its progeny do not in any way preclude the ALJ from considering inconsistencies in the record that undermine [the claimant's] credibility."  *Riegel v. Colvin*, 2014 WL 462525, at *8 (W.D. Va. Feb. 5, 2014).  In *Riegel*, the plaintiff testified that she did not seek treatment, because she did not have insurance, but she continued to smoke cigarettes against medical advice.  *Id.*  The court explained that the ALJ did not penalize the plaintiff for lacking insurance; rather, the ALJ penalized her "because of this inconsistency in the evidence."  *Id.* (citing *Blankenship v. Astrue*, 2009 WL 899426, at *8 (S.D. W. Va. Mar. 30, 2009) (plaintiff's credibility undermined by his ability to afford to smoke a pack of cigarettes per day)).

Similarly here, the ALJ did not fault Plaintiff for lacking insurance or funds to cover the copay for his Gabapentin prescription.  (R. at 82, 697.)  Rather, the ALJ explained that "one would expect [Plaintiff to] follow through with treatment and tak[e] medications regularly" if he "truly suffer[ed] to the extent alleged."  (R. at 82.)  Instead, Plaintiff reported using marijuana and drinking alcohol — which the ALJ noted — as well as smoking cigarettes every day for

fifteen years. (R. at 82, 615, 666, 756, 772, 775.) Plaintiff continued smoking cigarettes against

medical advice, (R. at 693, 697), and repeatedly failed to seek follow-up treatment as directed by

his doctors. (R. at 469, 729, 759, 764.) For example, in August 2013, Dr. Sessums told Plaintiff

to temporarily avoid work and heavy lifting until his follow-up examination, which Dr. Sessums

expected to occur several days later. (R. at 447-48.) But Plaintiff did not seek treatment again

until December 2013. (R. at 461.) In May 2014, Skinner instructed Plaintiff to contact her

office if he experienced persistent left upper extremity pain. (R. at 669.) After that appointment,

Plaintiff did not seek treatment again until September 2014. (R. at 692.) The ALJ did not fault

Plaintiff for his inability to afford medications or treatment. Instead, the ALJ noted the

inconsistencies between Plaintiff's non-compliance and his continued alcohol, tobacco and

marijuana use.

The court in *Riegel* further explained that because "the ALJ's opinion was well supported

by substantial evidence in the record, any error that the ALJ may have committed in referencing

[the claimant's] lack of resources would be harmless." 2014 WL 462525, at *8 (citing

*Blankenship*, 2009 WL 899426, at *8). Thus, the ALJ's credibility determination did not warrant

reversal. *Id.* Accordingly, the Court will also analyze the ALJ's credibility determination under

the traditional harmless error doctrine.

### a. Harmless Error.

When confronted with an error committed by the ALJ, the Court must determine whether

to apply the harmless error doctrine. *See Mascio*, 780 F.3d at 639 (analyzing whether the ALJ's

error in the credibility assessment constituted only harmless error); *Sharp v. Colvin*, 660 F.

App'x 251, 253 (4th Cir. 2016) (deeming the ALJ's errors harmless). The burden of establishing

a harmful error rests on "the party attacking the agency's determination." *Shinseki v. Sanders*,

38

556 U.S. 396, 409 (2009).  In determining the significance of an error, courts must consider, among other factors, "an estimation of the likelihood that the result would have been different . . . ." *Id.* at 411.  Further, "where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency 'can decide whether re-consideration is necessary.'" *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (quoting *Shinseki*, 640 F.3d at 414).

Against this standard, the Court concludes that, even if the ALJ improperly referenced Plaintiff's alleged inability to pay for medication, such error would be harmless, because Plaintiff suffered no prejudice.  As stated above, Plaintiff often ambulated using a cane and displayed normal strength on physical examination.  (R. at 445, 469, 550, 669, 692, 757, 773, 764.)  Plaintiff reported that that his feelings of numbness improved post-surgery and medication also helped relieve his pain.  (R. at 323, 469, 550, 552, 660, 668-69, 700, 759, 764, 775.)  As the ALJ noted, treatments notes show that no doctor recommended additional surgery following Plaintiff's April 2014 discectomy and fusion, nor did any treating physician opine that Plaintiff qualified as disabled or suffered from additional functional limitations beyond those included in the RFC.  (R. at 82.)  Indeed, Drs. Sessums and Helm imposed only temporary work restrictions on Plaintiff.  (R. at 447-48, 738.)  Following those restrictions, Plaintiff failed to follow-up with his treatment plan as directed.  After Dr. Sessums issued a three-to-four day work restriction, Plaintiff failed to follow-up with Dr. Kona as instructed and did not seek treatment again for four months.  (R. at 448, 461.)  Plaintiff likewise failed to obtain a functional capacity evaluation after Dr. Helm issued him a two-month work restriction.  (R. at 738.)  These records show that Plaintiff's symptoms lacked the severity alleged by Plaintiff.  Accordingly, substantial evidence

39

supports the ALJ's credibility determination, and Plaintiff has failed to show that he suffered any prejudice even if the ALJ erroneously considered his inability to pay.

### b. The ALJ Adequately Developed the Record.

As a final challenge to the ALJ's credibility determination, Plaintiff asserts that the ALJ failed to fully and fairly develop the administrative record. (Pl.'s Mem. at 22-23.) Plaintiff takes issue with the ALJ's failure to request a medical expert ("ME") to appear at the hearing or to order a consultative examination post-hearing. (Pl.'s Mem. at 23-24.) Plaintiff speculates that either measure would have corroborated his subjective complaints. (Pl.'s Mem. at 23.) Defendant does not address this facet of Plaintiff's credibility challenge.

Plaintiff bears the burden of proving his disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981) (citations omitted). The ALJ, however, "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (citations omitted). The ALJ retains the responsibility to develop the record in all proceedings. *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). When a claimant appears *pro se* before the ALJ, "the ALJ ha[s] a heightened duty of care to adequately develop the record." *Craig*, 76 F.3d at 591. When the claimant appears at the hearing with counsel — as Plaintiff did here — the ALJ may assume that the claimant "is making his strongest case for benefits." *Stuckey v. Colvin*, 2016 WL 403651, at *11 (E.D. Va. Jan. 11, 2016) (quoting *Nicholson v. Astrue*, 341 F. App'x 248, 253 (7th Cir. 2009) (citation omitted)); (R. at 92.)

Under the regulations, the ALJ must order an ME opinion in the following three scenarios: (i) the Appeals Council or a federal court orders it; (ii) "[t]here is a question about the

40

accuracy of medical test results reported, requiring evaluation of background medical test data;" or, (iii) the ALJ considers finding that a claimant's impairment(s) medically equal a listing. Hearings, Appeals and Litigation Law Manual ("HALLEX")[8] § 1-2-5-34(A)(1). The ALJ also possesses the discretionary authority to order an ME opinion in a number of circumstances, including when the ALJ "[b]elieves an ME may be able to assist the ALJ by explaining and assessing the significance of clinical or laboratory findings in the record that are not clear." HALLEX § I-2-5-34(A)(2).

The regulations likewise afford the ALJ discretion to determine whether to order a consultative examination. 20 C.F.R. §§ 404.1519a, 416.919a; *Bishop v. Barnhart*, 78 F. App'x 265, 268 (4th Cir. 2003). An ALJ may order a consultative examination if he cannot obtain needed information from a claimant's medical sources. §§ 404.1519a(a), 416.919a(a). For example, an ALJ might require a consultative examination when treating sources refuse to cooperate and provide evidence, when highly specialized medical evidence bears on the decision or when the record indicates a relevant change in the claimant's condition that the existing evidence does not address. §§ 404.1519a(b), 416.919a(b).

Here, the ALJ considered the entire record, discussed the relevant medical evidence, considered Plaintiff's testimony and the statements of Plaintiff's spouse, as well as the opinions of Dr. Sessums and the state agency physicians. (R. at 77-84.) Plaintiff argues that the ALJ failed to consider how his alleged functional limitations may have been caused by severe cervical spinal cord compression. (Pl.'s Mem. at 23.) Specifically, Plaintiff argues that the ALJ failed to

---

[8]     The HALLEX Manual conveys guiding principles, procedural guidance and information to the Office of Hearings and Appeals staff.  HALLEX includes policy statements and provides guidance for processing and adjudicating claims.  *See* HALLEX § I–1–0–1.  HALLEX is available online at: https://www.ssa.gov/OP_Home/hallex.

give adequate consideration to the December 2015 MRI, because the ALJ quoted Dr. Wallace's

treatment notes, rather than Dr. Hall's reading of the MRI. (Pl.'s Mem. at 6, 16, 23.) Dr. Hall's

reading of the MRI reported "flattening of the cervical spinal cord" at C2-C3, and his overall

impression described multilevel disease and abnormal appearance of the cervical spinal cord.

(R. at 732.) Dr. Wallace likewise noted that Plaintiff's MRI showed "some mild compression,"

which the ALJ discussed and cited in his opinion. (R. at 81, 728.) Plaintiff insists that the ALJ

ignored Dr. Hall's findings showing flattening of spinal cord at C2-C3, but the ALJ "is not

tasked 'with the impossible burden of mentioning every piece of evidence' that may be placed in

the Administrative Record." *McDaniel v. Astrue*, 2010 WL 3211050, at *6 (W.D.N.C. July 22,

2010), *report and recommendation adopted*, 2010 WL 3211048 (W.D.N.C. Aug. 12, 2010)

(quoting *Parks v. Sullivan*, 766 F. Supp. 627, 635 (N.D. Ill. 1991)); *see also Reid v. Comm'r of

Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211

(11th Cir. 2005)) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece

of evidence in his decision.").

Contrary to Plaintiff's argument that the ALJ misstated or ignored the results of the

December 2015 MRI, the ALJ stated that he based his opinion upon consideration of the entire

record, and the Court "takes [him] at [his] word." *See Reid*, 769 F.3d at 865 (citing *Hackett v.

Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)) (rejecting plaintiff's argument that the ALJ

erred in omitting reference to specific medical evidence, because plaintiff could not pinpoint any

single piece of evidence that would have changed the ALJ's decision). Although the ALJ did not

specifically reference Dr. Hall's observation that the December 2015 MRI showed "severe

flattening at C2-C3," the ALJ appropriately noted that the December 2015 MRI showed "some

mild compression" of the cervical spine, and that CSC Hospital discharged Plaintiff in stable

condition with a diagnosis of cervical spine pain. (R. at 81, 729.) Moreover, the neurosurgery department at CSC hospital also reviewed the MRI and found that Plaintiff's condition did not require acute intervention — a fact that Plaintiff ignores. (R. at 729.)

None of the scenarios set forth in HALLEX § I-2-5-34 that mandate an ME opinion apply here; thus, the decision to order an ME opinion or consultative examination rested in the ALJ's discretion. 20 C.F.R. §§ 404.1519a, 416.919a; HALLEX § I-2-5-34. After considering the entire record — including the records interpreting the December 2015 MRI — the ALJ properly concluded that Plaintiff's statements regarding the intensity and pain of his symptoms were not entirely credible. (R. at 77-84.) Thus, the ALJ did not err by failing to order an ME opinion or consultative examination.[9]

### 5. Additional Evidence Submitted to the Appeals Council Does Not Warrant Remand.

Next, Plaintiff argues that the Appeals Council erred by failing to remand Plaintiff's case in light of new evidence submitted to the Appeals Council. (Pl.'s Mem. at 13-19.) Plaintiff argues that the evidence that the Appeals Council rejected constitutes new and material evidence that could change the ALJ's decision, and that the Appeals Council erred by failing to explain why the evidence did not relate back to Plaintiff's disability determination, or why the evidence does not require remand. (Pl.'s Mem. at 19.) Plaintiff also argues that the evidence accepted by the Appeals Council requires remand, because it establishes Plaintiff's disability and calls into question the ALJ's assignment of weight to the state agency physicians' opinions. (Pl.'s Mem. at 19.) Defendant responds that the evidence rejected by the Appeals Council does not constitute

---

[9]    To the extent that Plaintiff insinuates that after-acquired evidence or evidence rejected by the Appeals Council proves that the ALJ ignored the significance Plaintiff's December 2015 MRI — and thus, failed to fully and fairly develop the record — the Court rejects that argument for the reasons explained below.

new and material evidence and that the evidence incorporated into the record does not change the fact that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 27-32.)

In determining whether substantial evidence supports the ALJ's decision, a district court cannot consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir.1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15 (1963)); *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir.1972) (citing *Vitek v. Finch*, 438 F.2d 1157 (4th Cir.1970)) (noting that reviewing courts are restricted to the administrative record in determining whether substantial evidence supports the decision).

However, when a claimant submits evidence not already in the record to the Appeals Council, the Appeals Council must consider that evidence if it is new, material, and relates "to the period on or before the date of the ALJ decision." 20 C.F.R. §§ 404.970(a)-(b), 416.1470(a)-(b); *see Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). "Evidence is new if it is not duplicative or cumulative and is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (internal quotations marks omitted).

If the new evidence submitted to the Appeals Council meets both those requirements, and the claimant shows good cause for not submitting the evidence at a previous time (e.g., a physical, mental, educational or linguistic limitation that prevented the claimant from notifying the ALJ or other circumstances beyond the claimant's control), then the court "must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." §§ 404.970, 416.1470; *Wilkins*, 953 F.2d at 96.

### a. New Evidence Accepted by the Appeals Council and Incorporated into the Record Does Not Require Remand for Additional Fact Finding by the ALJ.

The Appeals Council reviewed and incorporated into the record additional evidence submitted by Plaintiff dated on or before March 2, 2016 — the date of the ALJ's decision — and held that those records did not provide a basis for changing the ALJ's decision. (R. at 2.) This included the following evidence.

On June 2, 2015, Plaintiff presented to Dr. Helm, complaining of neck pain, numbness and weakness in his right leg. (R. at 738.) Physical examination revealed weakness of dorsiflexion on Plaintiff's right side and numbness in the L5 distribution. (R. at 738.) Dr. Helm placed Plaintiff on a two-month work restriction while Plaintiff obtained a functional capacity evaluation, and he recommended that Plaintiff have additional scans taken of the lumbar and cervical spines. (R. at 738.) On June 9, 2015, treating staff at UVA Health Systems took the additional scans. (R. at 740-43.) The cervical spine scans showed postsurgical changes of C3-C4 and C6-C7 ACDF with partial fusion of the disc spaces, with no evidence of hardware complication, as well as multilevel central canal stenosis and multilevel neuroforaminal stenosis. (R. at 740-43.) Scans of Plaintiff's lumbar spine revealed multilevel neuroforaminal stenosis and mild disc degeneration, but no significant central canal stenosis. (R. at 743.)

On January 21, 2016, Dr. McLean examined Plaintiff. (R. at 759.) Plaintiff used a cane, walked with an antalgic gait and complained of radiating low back pain and tingling. (R. at 759-60.) Plaintiff displayed normal strength in his left lower extremities and reduced (4/5) strength in his right lower extremities. (R. at 763.) He reported that medication improved his pain. (R. at 759.) Dr. McLean recommended that Plaintiff follow-up with a neurology specialist, but Plaintiff missed his scheduled appointment with the specialist. (R. at 756.) Scans taken of Plaintiff's lumbar spine that day revealed "minimal degenerative change" and "very small

anterolateral osteophytes at L2-3 and L3-4[,]" but "no compression fracture" or other significant abnormalities of Plaintiff's bones or joints. (R. at 768.)

On March 2, 2016, Plaintiff returned to Dr. McLean, complaining of back pain and numbness in his right leg. (R. at 764.) Plaintiff stated that medication helped his pain and he felt better overall. (R. at 764.) Plaintiff walked with an antalgic gait, but he did not use his cane and he displayed good muscle strength in his upper and lower extremities. (R. at 773.)[10] Dr. McLean instructed Plaintiff to follow-up with a neurologist. (R. at 774.)

Plaintiff argues that the new evidence of record establishes his disability and contradicts the opinions of the state agency physicians, which the ALJ afforded partial weight and great weight respectively. (Pl.'s Mem. at 19.) Specifically, Plaintiff argues that the Appeals Council should have remanded the case, so that the ALJ could consider and assign weight to the two-month work restriction imposed on Plaintiff by Dr. Helm on June 2, 2015. (Pl.'s Mem. 15.)

When the Appeals Council incorporates new and material evidence into the record and summarily denies the claimant's request for review, the Court may remand to the ALJ, "because '[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder.'" *Stoots v. Astrue*, 2012 WL 4717575, at *3 (E.D. Va. Oct. 1, 2012) (quoting *Meyer*, 662 F.3d at 707). For example, the Fourth Circuit explained in *Meyer* that "such analysis would be particularly helpful when the new evidence constitutes the only record evidence as to the opinion of the treating physician." 662 F.3d at 706. However, "the lack of such additional fact finding does not render judicial review impossible' — as long as the record provides 'an adequate

---

[10]     The Appeals Council also accepted a copy of Dr. Hall's reading of Plaintiff's December 2015 MRI and incorporated it into the record. (R. at 765-66.) However, the ALJ had Dr. Hall's findings before him on the date of the hearing. (R. at 94, 732-33.)

explanation of [the Commissioner's] decision." *Id.* at 707 (quoting *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)) (alterations in original).

The ALJ in *Meyer* denied Meyer's claim and emphasized the fact that the record lacked any indication that the treating physician placed restrictions on Meyer. *Id.* Meyer submitted the missing evidence from his treating physician and the Appeals Council accepted it into the record, but summarily denied Meyer's request for review. *Id.* This new evidence corroborated other physicians' opinions in the record rejected by the ALJ, and it conflicted with evidence credited by the ALJ. *Id.* Because "no fact finder . . . made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record," the court remanded the case to the ALJ. *Id.*; *see also Wilson v. Astrue*, 2012 WL 4717873, at *14 (E.D. Va. Oct. 1, 2012) (remanding decision of ALJ for further fact finding in light of new evidence submitted to Appeals Council and incorporated into the record, including three physical examinations and an application for a disabled parking placard). *But see Gainforth v. Colvin*, 2016 WL 3636840, at *9 (E.D. Va. May 9, 2016*), report and recommendation adopted*, 2016 WL 3636621 (E.D. Va. June 29, 2016) (finding substantial evidence supported ALJ's decision, "despite the opinions contained in the post-hearing submission" and incorporated into the record by the Appeals Council).

Unlike the missing treating physician opinion in *Meyer*, Dr. Helm's opinion does not prevent the Court from determining whether substantial evidence supports the ALJ's decision. In June 2015, Dr. Helm noted that Plaintiff displayed weakness and numbness on the right side on physical examination, and he "ke[pt] [Plaintiff] off work for two months" so that Plaintiff could pursue a functional capacity evaluation and have additional scans taken of his spine. (R. at 738.) Dr. Helm's opinion does not "necessarily conflict, compete, or contradict the evidence that

was before the ALJ" — in other words — "it did not raise any new questions as to [Plaintiff's]

limitations on review." *Gainforth*, 2016 WL 3636840, at *10.

At step three, the ALJ relied on the fact that no treating or examining physician found

that Plaintiff satisfied the criteria for Listing 1.04. (R. at 77.) Dr. Helm's opinion provides no

additional information, such as positive straight-leg raising test results in both the sitting and

supine position, to call into question the ALJ's step three finding. (R. at 738.) Like Dr.

Sessums' work-preclusive opinion, which the ALJ afforded no weight due to its temporary

nature, Dr. Helm likewise imposed only a temporary work restriction on Plaintiff. (R. at 448,

738.) Dr. Helm's opinion also does not contradict the opinions of the state agency physicians,

who concluded that Plaintiff could perform light work. (R. at 154, 169.) Dr. Howard, whose

opinion the ALJ afforded great weight, opined that Plaintiff's condition would not remain severe

enough "for 12 months in a row" to prevent him from working. (R. at 170.) The temporary

nature of Dr. Helm's work restriction corroborates this statement by Dr. Howard. Moreover,

unlike the opinions of the state agency physicians, Dr. Helm's opinion provided no insight as to

Plaintiff's functional capabilities. Instead, Dr. Helm concluded that Plaintiff could not work —

albeit for two months only — but that decision (the ultimate finding of disability) is reserved to

the Commissioner.[11]  (R. at 738;) 20 C.F.R. §§ 404.1527; 416.927.

---

[11]      Defendant also argues that Plaintiff cannot rely on Dr. Helm's June 2015 work restriction
"as a basis for challenging the ALJ's sound decision," because Plaintiff submitted the work
excuse to the Appeals Council "without good cause as to why he failed to inform the ALJ that he
needed more time for additional submissions." (Def.'s Mem. at 27.) While Defendant correctly
points out that under the regulations, the Appeals Council requires a showing of good cause to
consider new evidence, the Appeals Council here *did consider Dr. Helm's work restriction and
incorporated it into the record.* §§ 404.970, 416.1470; (R. at 2.) As explained above, once the
Appeals Council considered and incorporated the new evidence into the record, the pertinent
analysis becomes whether substantial evidence supports the ALJ's decision in light of the new

Plaintiff further argues that his June 9, 2015 scans — also not considered by the ALJ, but incorporated into the record — corroborate Dr. Helm's work restriction. (Pl.'s Mem. at 15.) While the June 2015 scans showed, *inter alia*, evidence of multilevel central canal stenosis, multilevel neuroforaminal stenosis and mild disc degeneration, they also revealed no evidence of hardware complication and no significant central canal stenosis in the lumbar spine. (R. at 742-43.) Moreover, Plaintiff's subsequent MRI in December 2015 — which the ALJ did consider — showed mild compression, which the neurosurgery department at CSC Hospital determined required no acute intervention. (R. at 81, 728-29.)

While Plaintiff continued to complain of numbness and pain during his appointments in June 2015, January 2016 and March 2016, (R. at 738, 759, 764), he reported that medication improved his pain. (R. at 759, 771.) Plaintiff walked with an antalgic gait, but did not require a cane during his March 2, 2016 appointment with Dr. McLean, which showed improvement in his condition. (R. at 771.) He also displayed good strength in his upper and lower extremities. (R. at 773.) This comports with the evidence considered and discussed in the ALJ's decision. (*E.g.*, R. at 80-81 (Plaintiff experienced pain, numbness and tingling, but he had good strength and sensation in his extremities in May 2014); R. at 81 (Plaintiff experienced numbness, but displayed normal strength in September 2014).) Because substantial evidence supports the ALJ's decision, the new evidence incorporated into the record does not warrant remand to the ALJ for additional fact finding.

---

evidence; or, whether the new evidence requires remand for additional fact finding. *Meyer*, 662 F.3d at 707; *Stoots*, 2012 WL 4717575, at *3.

### b. The Post-Decision Evidence Rejected by the Appeals Council Does Not Constitute New and Material Evidence.

The Appeals Council rejected evidence submitted by Plaintiff dated after March 2, 2016, and held that such evidence related to a later time and did not affect whether Plaintiff qualified as disabled on the date of the ALJ's decision. (R. at 2.) That evidence included the following.

On March 22, 2016, Plaintiff presented to Shi Lim, M.D., a neurologist at the Centra Southside Neurology Clinic, on referral from Dr. McLean. (R. at 37.) Plaintiff complained of shooting pain in his left arm and radiating pain, numbness and tingling on the right side. (R. at 37.) Plaintiff reported feeling weak generally and had difficulty walking due to pain. (R. at 37.) Dr. Lim reviewed Plaintiff's most recent MRI from 2016 and opined that it showed "multiple areas of myelomalacia and degenerative changes" post-surgery. (R. at 38.) She observed no evidence of polyneuropathy and opined that Plaintiff's pain, sensory symptoms and "clinical exam of asymmetrical reflexes" "could be explained by a spinal cord injury." (R. at 38.)

On April 13, 2016, Dr. Lim made an addendum to her March 22 treatment note, stating that Plaintiff had difficulty walking due to pain, could not sit for a long time due to the pain on his right side and could not lift heavy objects. (R. at 37.) Dr. Lim further stated that, "[Plaintiff's] pain is [sic] caused by a spinal cord injury in the past." (R. at 37.) After this single examination, Dr. Lim wrote a letter dated April 28, 2018, stating that Plaintiff had a history of spinal cord injury that prevented him from working, and that Plaintiff could not stand for long periods of time or lift heavy objects. (R. at 59.)

Plaintiff returned to Dr. McLean in April 2016. (R. at 51.) Plaintiff reported that Robaxin provided him with some pain relief, but he continued to suffer from ongoing cervical and lumbar pain with numbness in the right leg. (R. at 51.) Plaintiff also reported that he fell the

previous week due to his legs giving way and weakness on his right side, but he denied experiencing dizziness, palpitations or chest pain. (R. at 51.)

On April 28, 2016, Plaintiff presented to Virginia Kelli Rosas, FNP-C, at the CMG Neuroscience Center. (R. at 54-58.)  On physical examination, Plaintiff exhibited arm numbness, balance and gait difficulties, tingling hands and tingling feet. (R. at 55.)  Plaintiff used an assistive device to ambulate, had positive straight-leg raising test results on the right and displayed reduced (4/5) hip flexion and right knee extension. (R. at 57.)  However, Plaintiff also demonstrated intact sensation to light touch, 5/5 normal muscle strength and 5/5 upper extremity strength, with reduced (4/5) bilateral grip strength. (R. at 56.)

Plaintiff had another MRI on May 20, 2016, which showed "disc disease most notable at L4-L5[,]" but no evidence of a compression fracture. (R. at 40-41.)  On June 1, 2016, Plaintiff presented to Islam A. Saleh, M.D., for pain management. (R. at 42.)  On physical examination, Plaintiff exhibited weakness and pain in the arms and legs, balance issues, gait instability, numbness in his feet or hands and positive seated straight-leg raising test results bilaterally. (R. at 44-45.)  Plaintiff also demonstrated reduced (4/5) muscle strength, but had normal reflexes. (R. at 45.)  Dr. Saleh's examination of Plaintiff's cervical spine showed limited range of motion, but normal strength and tone. (R. at 45.)  Dr. Saleh discussed Plaintiff's December 2015 MRI, noting "significant cord signal changes," "chronic signs of myelomalacia" and "flattening of the cord above the level of fusion at C3-[C4]." (R. at 46.)  Dr. Saleh noted that Plaintiff's pain responded partially to Gabapentin and other medications in the past, and he prescribed low dose oral opioids to Plaintiff for "better pain control." (R. at 46.)

On September 8, 2016, Plaintiff presented to neurosurgeon Brian M. Cameron, M.D., at Virginia Commonwealth University Health, MCV Hospitals. (R. at 34.)  Plaintiff reported a

51

history of falls, difficulty with balance and gait, and "recent left upper extremity numbness and tingling." (R. at 35.) Though Plaintiff appeared distressed and exhausted, he displayed full strength bilaterally in his upper and lower extremities and normal reflexes, except in the left pectoralis and the clonus on the left side. (R. at 35.) Dr. Cameron noted that Plaintiff had an antalgic gait and experienced diminished sensation to light touch. (R. at 35.) Dr. Cameron advised Plaintiff to continue with his conservative course of treatment with medication; but, if Plaintiff quit smoking, Dr. Cameron suggested that Plaintiff may have an option to undergo additional surgery. (R. at 35.)

Plaintiff returned to Dr. Cameron on December 8, 2016, complaining of "fairly significant and sometimes activity-limiting pain through his neck and into his arms and legs." (R. at 9-10.) Dr. Cameron noted that Plaintiff continued smoking. (R. at 10.) Although Plaintiff appeared uncomfortable upon physical examination, he required no assistance getting on the exam table. (R. at 10.) Dr. Cameron observed some weakness in Plaintiff's left hand, but Plaintiff otherwise displayed 5/5 strength bilaterally in his upper and lower extremities and normal reflexes in the biceps, triceps, knees and ankles, but no pectoralis reflex. (R. at 10.) Plaintiff had a stiff walk, more noticeable on the right leg. (R. at 10.) Dr. Cameron reviewed Plaintiff's December 2015 MRI and noted that the cervical spine appeared "to be reasonably well decompressed," but found no further surgical intervention necessary, because little could be done to further alter Plaintiff's cervical spine. (R. at 10.) Dr. Cameron opined that Plaintiff would likely suffer from "lifelong activity-limiting pain and dysfunction that is unlikely to improve even with maximal intervention." (R. at 10.)

Plaintiff argues that the opinions of Drs. Lim and Cameron, which the Appeals Council rejected as relating to a period after the ALJ's decision, constitute new and material evidence that

requires remand. (Pl.'s Mem. at 13-19.)  New evidence need not have existed on or before the date of the ALJ's decision; "rather, the evidence must shed light on the applicant's disability status during the relevant time period." *Babcock v. Comm'r of Soc. Sec.*, 2011 WL 2899169, at *6 (E.D. Va. July 18, 2011) (citing *Reichard v. Barnhart*, 285 F. Supp. 2d 728, 733 (S.D. W. Va. Sept. 29, 2003) (rejecting psychologist's post-decision report as not relating to the relevant time period).  Here, neither Dr. Lim nor Dr. Cameron examined Plaintiff before the ALJ issued his opinion on March 2, 2016.  (R. at 9-10, 34, 37-38, 51, 59.)  Thus, the physical examinations conducted by Drs. Lim and Cameron reflect Plaintiff's condition *after* the ALJ issued his decision, and do not relate back to the period of disability.[12]  (R. at 10, 35, 38.)

To the extent that Drs. Lim and Cameron discussed Plaintiff's December 2015 MRI and other scans considered by the ALJ or the Appeals Council, such evidence does relate back to the relevant period.  (R. at 37-38, 57, 59.)  However, this evidence still does not constitute new and

---

[12]     Likewise, neither the physical examinations conducted by Dr. McLean, Dr. Saleh or Nurse Rosas *after* the ALJ's decision, nor Plaintiff's May 2016 MRI, relate to the relevant time period, and the Appeals Council properly rejected them. (R. at 37-38, 40-46, 54-56.) Plaintiff argues this evidence establishes that he meets the criteria for Listing 1.04A. (Pl.'s Mem. 11-12, 14.) Even if those records related to the date on or before the ALJ's decision — which they do not — nothing contained in the evidence rejected by the Appeals Council affirmatively establishes that Plaintiff satisfies the listing criteria. Although Nurse Rosas and Dr. Saleh observed that Plaintiff produced straight-leg raising test results, Nurses Rosas treatment notes do not indicate whether she conducted the test in the sitting or supine position, and Dr. Saleh conducted the test in the sitting position only. (R. at 45, 57.) Listing 1.04A requires positive results in both the sitting and supine position. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04A.

Plaintiff further argues that the evidence rejected by the Appeals Council establishes additional limitations not included in the RFC and corroborates Plaintiff's subjective statements regarding his pain and functional limitations. (Pl.'s Mem. at 20, 27.) But Plaintiff's new complaints of hand numbness, (R. at 44, 55), and Dr. Lim's finding that Plaintiff struggled with sitting and standing, (R. at 37), do not relate to the time period on or before the ALJ's decision and have no bearing on the validity of the ALJ's March 2016 decision. To the extent that Plaintiff's condition may have worsened since the ALJ issued his decision, Plaintiff's remedy lies in filing a new application for benefits. 20 C.F.R. §§ 404.620(a)(2), 416.330(b).

material evidence in accordance with *Meyer*; therefore, the Appeals Council rightly rejected it. 662 F.3d at 705.

During Plaintiff's first and only appointment with Dr. Lim in March 2016 — a few weeks after the ALJ's decision — Dr. Lim reviewed Plaintiff's neck MRI from 2016, noting "multiple areas of myelomalacia[,] and degenerative changes" post-surgery. (R. at 38.) Dr. Lim further noted that Plaintiff's MRI of the lumbar spine showed some degenerative changes and opined that "a spinal cord injury in the past" caused Plaintiff's pain. (R. at 37.) The record does not make clear which MRI of Plaintiff's neck and lumbar spine Dr. Lim reviewed, but the only scans incorporated into the record from 2016 showed no significant abnormalities and no compression fracture. (*See* R. at 760, 768 (impression of Plaintiff's lumbar spine, dated January 21, 2016).) Dr. Lim's interpretation of those scans may constitute new evidence, because the Appeals Council incorporated interpretations of the Janaury 21, 2016 scans into the record after the ALJ issued his decision. (R. at 2, 738.) However, Dr. Lim's conclusory opinion does not qualify as material, because it "is insufficiently forceful to upset the ALJ's judgment under the applicable standard of review." *Babcock*, 2011 WL 2899169, at \*6. In addition to lacking clarity as to which MRIs Dr. Lim interpreted, he based his opinion on a single examination of Plaintiff. (R. at 38.) The Court finds such evidence unlikely to change the ALJ's decision.

Dr. Cameron's review of Plaintiff's December 2015 MRI likewise does not constitute new or material evidence. The ALJ already considered and discussed Plaintiff's December 2015 MRI in his opinion, which makes Dr. Cameron's opinion cumulative. (R. at 81.) Dr. Cameron also opined that Plaintiff will suffer "life-long activity limiting pain and dysfunction that is unlikely to improve." (R. at 10.) This extreme opinion reflects Dr. Cameron's observations of

54

Plaintiff in September and December 2016 — months after the ALJ's decision.  (R. at 9-10, 35.)
As explained above, those observations do not relate to the relevant time period.

Finally, Plaintiff argues that the Appeals Council erred by "fail[ing] to explain why the
new evidence does not relate back to . . . [P]laintiff's disability determination or why it does not
warrant remand."  (Pl.'s Mem. at 19.)  But the regulations do not require the Appeals Council to
explain their rationale for denying a claimant's request for review.  *Meyer*, 662 F.3d at 706.
When the Appeals Council *grants* a claimant's request for review and issues its own decision—
rather than remanding to the ALJ — it must explain its reasoning and follow the same rules as
the ALJ when considering opinion evidence.  *Id.* at 705.  By contrast, when the Appeals Council
*denies* the claimant's request for review, it does not "issue a decision," within the meaning of the
regulations and has no duty to explain its reasoning for denying review.  *Id.*  Here, the Appeals
Council denied Plaintiff's request for review and had no further duty to explain its rationale.

### 6.   The Court Should Not Accept the After-Acquired Report of Dr. Lorber.

Lastly, Plaintiff requests that the Court exercise its "equitable authority" to accept Dr.
Lorber's report, which Plaintiff argues constitutes new and material evidence.  (Ex. 2 to Pl.'s
Suppl. Mot. ("Pl.'s Suppl. Mem.") (ECF No. 25-2) at 2-14.)  Defendant argues that the Court
should reject the report, because it relates to Plaintiff's new application for benefits — not the
relevant period in this case.  (Def.'s Mem. at 36-40.)

Generally, the Court cannot consider evidence not presented to the ALJ.  *Smith,* 99 F.3d
at 638 n.5 (citations omitted).  However, sentence six of 42 U.S.C. § 405(g) provides that the
court "may at any time order additional evidence to be taken before the Commissioner of Social
Security, but only upon a showing that there is new evidence which is material and that there is
good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42

U.S.C. § 405(g). The decision to remand rests within the sound discretion of the district court. *Williams v. Astrue*, 2012 WL 1267890, at *7 (E.D. Va. Mar. 28, 2012), *report and recommendation adopted*, 2012 WL 1252620 (E.D. Va. Apr. 13, 2012) (additional citations omitted).

The evidence must meet four requirements: (1) it must relate to the period before the ALJ's decision and not be merely cumulative; (2) it must have a material effect on the outcome; (3) good cause must exist for the claimant's failure to submit the new evidence to the ALJ; and (4) the plaintiff must make a general showing of the evidence. *Borders v. Heckler*, 777 F.2d 954, 954-55 (4th Cir. 1985), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991); *Brown v. Comm'r of Soc. Sec.*, 2010 WL 2787898, at *7 n.5 (E.D. Va. June 21, 2010) (noting that the Fourth Circuit continues to cite *Borders* as the standard for new evidence); *Washington v. Comm'r of Soc. Sec.*, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009) (applying the *Borders* four-part test to new evidence). Plaintiff has the burden of showing that the new evidence satisfies all four factors. *Tyree v. Berryhill*, 2018 WL 1050460, at *2-3 (E.D. Va. Feb. 26, 2018) (citing *Keith v. Astrue*, 2012 WL 2425658, at *2 (W.D. Va. June 22, 2012)). On the other hand, when that new evidence shows a worsening of the claimant's alleged symptoms after the ALJ's decision, filing a new application for benefits constitutes the appropriate course of action. 20 C.F.R. §§ 404.620(a)(2), 416.330(b) (providing that if an applicant meets the requirements for disability after the period in which his application was in effect, he must file a new application).

Plaintiff obtained the report of Dr. Lorber in connection with a new application for benefits. (Pl.'s Suppl. Mem. at 1.) Dr. Lorber reviewed Plaintiff's medical records, including the December 2015 MRI and the post-decision records rejected by the Appeals Council from

Drs. Lim, Saleh and Cameron, but Dr. Lorber did not examine Plaintiff. (Ex. 1 to Pl.'s Suppl.

Mot. (Sept. 28, 2017 Report of Dr. Lorber ("Dr. Lorber's Report") (ECF No. 25-1) at 2-4.)

Referring to Plaintiff's December 2015 MRI, Dr. Lorber states, "[o]f great significance is that

the MRI . . . revealed ongoing spinal cord impingement resulting in spinal cord flattening [sic]

due to disc impingement at the C2-[C]3 level." (Dr. Lorber's Report at 2.) Dr. Lorber

concluded that Plaintiff's 2014 surgery did not address his "entire cervical spinal pathology," and

that Plaintiff satisfied the criteria for Listing 11.08, which relates to spinal cord injuries.[13] (Pl.'s

Supp. Mem. at 3, n.2; Dr. Lorber's Report at 2-4.) Dr. Lorber gave Plaintiff an "extremely

poor" prognosis, but opined that Plaintiff qualified as a candidate for additional "extensive

surgery to his cervical spine." (Dr. Lorber's Report at 4.)

Dr. Lorber's report likely satisfies the second and fourth *Borders* factors. Dr. Lorber's

opinion that Plaintiff satisfies Listing 11.08 — a listing not specifically considered by the ALJ —

may have materially affected the outcome. (Pl.'s Suppl. Mem. at 3, n.2; Dr. Lorber's Report at

2-4.) Plaintiff also made a general showing of the evidence. However, Plaintiff has failed to

show that Dr. Lorber's report satisfies the first and third *Borders* factors.

With respect to the first factor, Dr. Lorber based his report on Plaintiff's 2014 surgery

and the December 2015 MRI, which relate back to the ALJ's decision, but constitute duplicative

evidence already considered and discussed by the ALJ. (R. at 81, 723; Dr. Lorber's Report at 2-

4.) To the extent that Dr. Lorber also based his opinion on treatment records from Drs. Lim,

---

[13]     Dr. Lorber's report incorrectly lists the date of Plaintiff's December 2015 MRI as
November 28, 2015, and Dr. Lorber incorrectly refers to Listing 11.18, which relates to
traumatic brain injuries, instead of Listing 11.08. (R. at 728; Pl.'s Suppl. Mem. at 3, n.2; Dr.
Lorber's Report at 2-4.)

Saleh and Cameron, those records do not relate back to the period before the ALJ's decision, and the Appeals Council rejected them accordingly. (R. at 2; Dr. Lorber's Report at 3.)

Plaintiff also failed to show good cause for his failure to submit the evidence before the ALJ. This Court has previously found that good cause existed for a claimant's late submission of evidence "simply because the report was completed only after the ALJ's decision." *Williams*, 2012 WL 1267890, at *10; *see also Parker*, 2015 WL 5793695, at *25 ("There is good cause for [p]laintiff's failure to submit the evidence earlier simply because Dr. Bloem saw Plaintiff, examined her MRIs and completed a Multiple Impairment Questionnaire after the ALJ's decision."). In *Williams*, the Court qualified its finding of good cause, noting that "[a]ny counterargument that [p]laintiff should have proffered such evidence sooner is also unavailing because, . . . [plaintiff] timely requested that the ALJ permit the very consultative examination that yielded [the new evidence] . . . . Any neglect is therefore excusable." 2012 WL 1267890, at *10. Plaintiff made no such request here; rather, Plaintiff obtained Dr. Lorber's opinion — dated over eighteen months after the ALJ's decision — solely in connection with his new claim for benefits. (Pl.'s Suppl. Mem. at 1 (noting that Plaintiff consulted with Dr. Lorber "in the context of filing a new claim for Title II, Social Security Disability Benefits").) Thus, the Court does not find Plaintiff's neglect excusable.

Because Plaintiff failed to show that Dr. Lorber's report satisfied all of the *Borders* factors, the Court recommends that this additional evidence be rejected.

## V.   CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 15) be DENIED, that Plaintiff's Motion for the Court to Accept the After-Acquired Report of Dr. Lorber (ECF No. 25) be DENIED, that Defendant's Motion for

Summary Judgment (ECF No. 28) be GRANTED and that the final decision of the

Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States

District Judge Robert E. Payne and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and**

**recommendations of the Magistrate Judge contained in the foregoing report within**

**fourteen (14) days after being served with a copy of this report may result in the waiver of**

**any right to a de novo review of the determinations contained in the report and such failure**

**shall bar you from attacking on appeal the findings and conclusions accepted and adopted**

**by the District Judge except upon grounds of plain error.**

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  August 7, 2018